2014 CO 32

**Erin A. YOUNG, individually and on behalf of and as next friend of C.Y.; and C.Y., a minor, through his parent Erin A. Young, Petitioners**

v.

**BRIGHTON SCHOOL DISTRICT 27J, Respondent.**

**Supreme Court Case No. 12SC543**

Supreme Court of Colorado.

May 19, 2014

Bendinelli Law Firm, PC, Adrian A. Sak, Marc F. Bendinelli, Lain A. Lawrence, Westminster, Colorado, Attorneys for Petitioners.

Caplan and Earnest LLC, W. Stuart Stuller, William J. Kowalski, Toni J. Wehman, Boulder, Colorado, Attorneys for Respondent.

CHIEF JUSTICE RICE delivered the Opinion of the Court.

¶ 1 We granted certiorari to consider two novel questions of law. First, we examine the interaction between the various waiver provisions in the Colorado Governmental Immunity Act ("CGIA"), § 24–10–106(1)(a)–(h), C.R.S. (2013). When successfully applied, these waivers strip public entities of their immunity from tort liability. We hold that the CGIA's waiver provisions are not mutually exclusive. Rather, they provide alternative avenues for exposing a public entity to liability, and more than one waiver may be triggered by a given factual scenario and tested by the trial court. We therefore reverse the court of appeals to the extent it held that the consideration of one CGIA waiver provision affirmatively precludes consideration of any alternative waiver provisions.

¶ 2 Second, we determine whether the "recreation area waiver" provided in section 24–10–106(1)(e), which subjects public entities to liability for injuries resulting from a "dangerous condition of any ... public facility located in any ... recreation area maintained by a public entity," applies to injuries sustained on a walkway adjacent to a public school playground. We hold that the recreation area waiver's requirements were not met here because the walkway at issue was not itself a "public facility," nor was it a component of a larger collection of items that qualified as a "public facility." Accordingly, we affirm the court of appeals' holding that the

school district retains its immunity, albeit for different reasons.

## I. Facts and Procedural History

¶ 3 In August of 2008, C.Y., a minor child, slipped and fell in a puddle of water that had accumulated on a concrete walkway at his public elementary school. This walkway was located at the bottom of a set of outdoor steps, a short distance away from the elementary school's exterior cafeteria doors. The walkway ran between both the school playground and the school building. The specific part of the walkway where C.Y. fell immediately abutted a small mulch area next to the school playground.

¶ 4 As a result of his fall, C.Y. sustained a severe head injury, and Petitioners, Erin A. Young, C.Y.' s mother, and C.Y. (collectively "the Youngs"), sued Respondent, Brighton School District 27J ("the District"), asserting a premises liability claim.[1] The District then brought a Motion to Dismiss ("Motion") pursuant to C.R.C.P. 12(b)(1), arguing that the trial court lacked subject matter jurisdiction because the District, a public entity, was immune from liability under the CGIA. See § 24–10–103(5), C.R.S. (2013) (defining "public entity" in relevant part as a "school district"); § 24–10–108, C.R.S. (2013) ("Except as provided in sections 24–10–104 to 24–10–106, sovereign immunity shall be a bar to any action against a public entity for injury which lies in tort or could lie in tort...."). In response, the Youngs asserted that the District had waived its immunity under the recreation area waiver, section 24–10–106(1)(e).

¶ 5 Without conducting an evidentiary hearing, the trial court considered whether section 24–10–106(1)(d)(III) ("the icy walkway waiver") applied to C.Y.' s injuries. The icy walkway waiver makes public entities liable for injuries resulting from a "dangerous condition caused by an accumulation of snow and ice ... on walks leading to a public building." § 24–10–106(1)(d)(III). The trial court found that the icy walkway waiver did not apply because the Youngs did not allege

---

1. Initially, the Youngs sued the District as well as C.Y.'s elementary school, asserting premises liability, negligence, and res ipsa loquitur theories of recovery against both defendants. The Youngs dropped their claims against the elementary school in response to the District's Motion to Dismiss, and the trial court thereafter dismissed the elementary school as a defendant.

that snow and ice contributed to C.Y.' s injuries.

¶ 6 While the trial court summarily declined to apply the icy walkway waiver, it ordered limited discovery and an evidentiary hearing pursuant to *Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d 916, 924 (Colo.1993), to determine whether the recreation area waiver applied to C.Y.' s injuries. The recreation area waiver renders public entities liable for injuries resulting from a "dangerous condition of any . . . public facility located in any . . . recreation area maintained by a public entity." § 24–10–106(1)(e). At the *Trinity* hearing, the trial court heard uncontroverted testimony that the walkway where C.Y. fell was adjacent to the playground and that students played on this walkway—at least occasionally—while en route to and from recess.

¶ 7 Relying on the latter testimony, the trial court concluded the walkway at issue qualified as a "recreation area" under section 24–10–106(1)(e) because it was used for recreation, even though it was not formally designated for such purposes. To bolster its conclusion, the trial court noted that to find otherwise "would require the Court to ignore the proclivities of elementary school children." Further, the trial court concluded that the walkway *also* qualified as a "public facility," as it was an integral part of the public school, itself a public facility. In its June 21, 2011 Order ("Order"), the trial court thus concluded that the District had waived its immunity under the recreation area waiver and denied the District's Motion.[2]

¶ 8 Thereafter, the District filed an interlocutory appeal pursuant to section 24–10–108. A division of the court of appeals unanimously reversed the trial court's Order in an unpublished opinion. Applying the canon of statutory construction that specific statutory language prevails over more general language, the court of appeals held that the icy walkway waiver was the only waiver provision that the trial court should have considered, to the exclusion of all other waivers. In particular, it held that the icy walkway waiver controlled because it was the only waiver provision that dealt specifically with walkways. The court of appeals ultimately concluded, however, that the Youngs did not successfully meet the requirements to waive the District's immunity under the icy walkway waiver, because it was undisputed that a puddle of water, rather than snow and ice, caused C.Y.'s fall. Having determined that the District retained its immunity,[3] the court of appeals reversed the trial court's denial of the District's Motion and remanded the case for dismissal of the Youngs' premises liability claim.

¶ 9 Thereafter, the Youngs petitioned this Court for certiorari review of the court of appeals' decision, arguing that the court of appeals erred in declining to analyze whether the recreation area waiver applied to C.Y.' s injuries. We granted certiorari review and affirm in part.

## II. Standard of Review

¶ 10 Governmental immunity implicates issues of subject matter jurisdiction that are determined in accordance with C.R.C.P. 12(b)(1). *Swieckowski v. City of Ft. Collins*, 934 P.2d 1380, 1383–84 (Colo.1997). Under C.R.C.P. 12(b)(1), the trial court may allow for limited discovery and conduct an evidentiary hearing to resolve any factual questions that implicate the court's jurisdiction. *See id.* at 1384 (citing *Trinity Broad.*, 848 P.2d at 924–25). When the jurisdictional facts are undisputed following a *Trinity* hearing, as here, the trial court's jurisdictional determination is one of law, which we review de novo. *See id.; see also City of Colo. Springs v. Conners*, 993 P.2d 1167, 1171

---

2. The trial court denied the District's Motion without determining whether C.Y.' s injury fulfilled a prerequisite for application of the recreation area waiver; i.e., whether the puddle where C.Y. fell qualified as a "dangerous condition." *See* § 24–10–103(1.3), C.R.S. (2013) (defining "dangerous condition"). The trial court also found, without analysis, that the walkway was "maintained by" a public entity.

3. By virtue of its holding that the icy walkway waiver precluded consideration of all other waiver provisions in the CGIA, the court of appeals necessarily did not determine whether the recreation area waiver applied to C.Y.' s injuries. It did state, however, that the record did not the support application of the recreation area waiver.

(Colo.2000) (noting that whether a trial court has jurisdiction to hear a particular claim under the CGIA is a matter of statutory construction subject to de novo review).

### III. Analysis

¶ 11 Resolution of this case requires us to construe various provisions of the CGIA. Our primary task when construing a statute is to ascertain and give effect to the legislature's intent. *Springer v. City & Cnty. of Denver*, 13 P.3d 794, 799 (Colo.2000); *see also State v. Nieto*, 993 P.2d 493, 502 (Colo.2000) ("Legislative intent is the polestar of statutory construction."). We look first to the language of the statute, giving words their plain and ordinary meaning; if the plain language of the statute demonstrates a clear legislative intent, we look no further. *Springer*, 13 P.3d at 799. A commonly accepted meaning is preferred over a strained or forced interpretation. *M.S. v. People*, 812 P.2d 632, 636 (Colo.1991). We will not adopt statutory constructions that defeat legislative intent or that lead to unreasonable or absurd results. *Nieto*, 993 P.2d at 505. Additionally, we read the statutory design as a whole, giving consistent, harmonious, and sensible effect to all of its parts. *Id.* at 501.

¶ 12 On the other hand, when we determine that the language of a statute is ambiguous, we may also look to other tools of statutory interpretation to decipher legislative intent. *Grant v. People*, 48 P.3d 543, 547 (Colo.2002). Often the best guides to legislative intent are the context in which the statutory provisions appear and any accompanying statements of legislative policy, such as a legislative declaration. *Stamp v. Vail Corp.*, 172 P.3d 437, 443 (Colo.2007); *see also* § 2–4–203(1), C.R.S. (2013) (noting that when statutory ambiguity exists, a reviewing court may consider, among other things, the object sought to be attained, the consequences of a particular construction, and the legislative declaration). Additionally, the meaning of an ambiguous statutory term may be ascertained by reference to the meaning of words associated with it. *State v. Hartsough*, 790 P.2d 836, 838 (Colo.1990).

¶ 13 Prior to reviewing C.Y.' s claims, it is helpful to consider the purposes of the CGIA. The CGIA acts as a shield that generally protects public entities, such as the District, from tort liability. *See Medina v. State*, 35 P.3d 443, 453 (Colo.2001). The CGIA also, however, automatically waives this immunity shield in a limited number of situations that are explicitly defined by the statute. *See* § 24–10–102 (stating that public entities should be held liable "only to such an extent and subject to such conditions as are provided by this article"); *see also Bertrand v. Bd. of Cnty. Comm'rs of Park Cnty.*, 872 P.2d 223, 227 (Colo.1994) (noting that "there are a limited number of situations in which the legislature deemed it appropriate to waive the defense of sovereign immunity"). Because governmental immunity established by the CGIA derogates Colorado's common law, we strictly construe the Act's immunity provisions, and as a logical corollary, we broadly construe its waiver provisions. *See Springer*, 13 P.3d at 798 (discussing the history of this Court's abrogation of Colorado's common law of governmental immunity in 1971, the legislature's subsequent enactment of the CGIA in response to this abrogation, and the rule to broadly construe the CGIA's waiver provisions); *see also Walton v. State*, 968 P.2d 636, 643 (Colo.1998) ("[T]he CGIA's waiver provisions are entitled to deferential construction in favor of victims injured by the negligence of governmental agents, while the immunity provisions are subject to strict construction."). Despite this general rule of broad construction, however, our touchstone remains the intent of the legislature. *See Hartsough*, 790 P.2d at 838.

### A. The Colorado Governmental Immunity Act's Waiver Provisions Are Not Mutually Exclusive

¶ 14 With these principles of statutory construction and the purposes of the CGIA in mind, we now examine the relationships among the CGIA's various waiver provisions. Under the CGIA, there are several different circumstances that—upon sufficient proof of particular jurisdictional facts—automatically waive a public entity's immunity. *See* § 24–10–106(1)(a)–(h) (providing a list of immunity waivers). Significantly, however, the CGIA

does not provide specific guidance as to how the immunity waivers interact with one another, nor does it specify what should be done when more than one waiver provision could be triggered in a particular factual scenario. *See* § 24–10–106. Accordingly, we must determine legislative intent in the absence of explicit guidance.

¶ 15 We hold that the CGIA's waiver provisions are not mutually exclusive. Rather, each provision provides an alternative avenue for stripping a public entity of its immunity, which may (or may not) be triggered by a particular factual scenario. Thus, the court of appeals erred when it mechanically concluded that the icy walkway waiver was the *only* waiver provision that could be triggered by C.Y.' s injuries merely because C.Y.' s injuries occurred on a walkway. Our conclusion is anchored in the absence of conflict between the CGIA's waiver provisions and the statutory context.

¶ 16 Contrary to the court of appeals' holding, the CGIA's waiver provisions are amenable to a harmonious construction. Thus, the court of appeals erred when it cited—as the primary basis for its holding—the canon of statutory construction that specific statutory language will prevail over more general language. That canon is only applicable when "a conflict between two statutory provisions is *irreconcilable.*" *Martin v. People*, 27 P.3d 846, 860 (Colo.2001) (emphasis added); *see also* § 2–4–205, C.R.S. (2013) ("If the conflict between the provisions is irreconcilable, the special ... provision prevails...."). To the extent that two statutory provisions are actually in conflict, they should be construed, if possible, to give effect to both. § 2–4–205.

¶ 17 Simply considering whether multiple CGIA waiver provisions might apply in a particular case does not create a conflict,

much less an irreconcilable one. Immunity is a threshold issue, as it is designed to protect a public entity from liability in the most preliminary stages of a lawsuit. Thus, the application of one waiver provision over another has no substantive impact on a case. Rather, the application of *any* CGIA waiver is only the first step; specifically, it removes the immunity shield and exposes an otherwise-protected public entity to *potential* liability.[4] Indeed, courts regularly test multiple waiver provisions at the same time in determining whether a plaintiff has alleged sufficient facts to waive immunity.[5] *See, e.g., Montes v. Hyland Hills Park & Recreation Dist.*, 849 P.2d 852, 854 (Colo.App.1992) (considering the applicability of more than one CGIA waiver provision); *Seder v. City of Ft. Collins*, 987 P.2d 904, 906–09 (Colo.App.1999) (same); *Curtis v. Hyland Hills Park & Recreation Dist.*, 179 P.3d 81, 84–85 (Colo.App. 2007) (same).

¶ 18 The purported conflict between waiver provisions implicitly underlying the court of appeals' holding stands in sharp contrast to the truly irreconcilable conflict illustrated by *Norsby v. Jensen*, 916 P.2d 555, 560 (Colo. App.1995). In *Norsby*, an inmate was injured while participating in a special "boot camp" program instituted by the legislature, and the inmate sued the Department of Corrections ("DOC"). *Id.* at 558. The legislation creating the boot camp program provided that the "department [of corrections] is absolved of liability for participation in the program." § 17–27.7–103(1), C.R.S. (2013). This specific immunity provision stood in direct—that is, irreconcilable—conflict with section 24–10–106(1)(b) of the CGIA, which waives immunity for the operation of any public correctional facility. In other words, the statute creating the boot camp program dictated that the DOC *was* immune from

---

4. After showing that a CGIA waiver provision applies, a plaintiff must still prove his or her tort claim against the public entity to ultimately prevail, just as any other plaintiff would against a non-governmental defendant. *See* § 24–10–107, C.R.S. (2013) ("[W]here sovereign immunity is not a bar under section 24–10–106, liability of the public entity shall be determined in the same manner as if the public entity were a private person.").

5. Although a trial court's determination that the plaintiff has met the requirements of a particular CGIA waiver provision might render further analysis of other waiver provisions superfluous, the trial court might choose to conduct further analysis as the basis of an alternative holding.

liability for the inmate's injuries, while the CGIA dictated that the DOC *was not* immune from liability.[6]

¶ 19 In *Norsby*, the court of appeals examined both statutory provisions and held that the immunity provision in section 17–27.7–103(1) should control over the CGIA waiver provision. 916 P.2d at 560. It so concluded because the statute creating the boot camp program was enacted after the CGIA and it was more specific than the more general waiver in the CGIA. *Id.* Unlike the obvious conflict illustrated in *Norsby*, however, the various waiver provisions in the CGIA are easily harmonized: none directly conflict and each can be considered individually to see if it fits the particular factual scenario of a case without inquiry into, or effect on, the other waivers.

¶ 20 Moreover, the statutory context supports our holding that the CGIA's waivers are not mutually exclusive. Had the legislature intended the waivers to be mutually exclusive, it would have affirmatively expressed this intent in the plain language of the statute. For example, the legislature might have provided a specific mechanism for determining *which* waiver provision should apply when a single injury implicates multiple waiver provisions. Alternatively, the legislature might have written the waivers so as to ensure that they did not overlap; that is, they would have drawn the "boundaries" between the waivers in very sharp relief. To the contrary, the CGIA contains multiple waivers that could obviously be triggered by the same injury. For example, an injury at a jail could very well implicate both the waiver for the operation of a correctional facility or jail (section 24–10–106(1)(b)) and the waiver for a dangerous condition of a jail (section 24–10–106(1)(e)).

¶ 21 If the consideration of one waiver were intended to preclude the consideration of all other waivers, providing waivers that clearly overlap in this fashion—particularly without providing the necessary direction or hierarchy to guide courts in choosing be-

tween them—would be illogical. Absent any indication that the legislature intended for the CGIA's waivers to operate exclusively, and in light of our command to broadly construe the CGIA's waivers, we will not add statutory terms to create a conflict where none exists. *See Holcomb v. Jan–Pro Cleaning Sys. of S. Colo.*, 172 P.3d 888, 894 (Colo. 2007) ("We do not add words to the statute or subtract words from it.").

### B. A Walkway Is Not a "Public Facility"

¶ 22 The recreation area waiver provides, in relevant part, that governmental immunity is waived when an injury results from a "dangerous condition of any ... public facility located in any ... recreation area." § 24–10–106(1)(e). We hold that the recreation area waiver does not apply here and therefore does not deprive the District of immunity. In so holding, we note that there are three ways a purported public facility can qualify as a "public facility" for purposes of the recreation area waiver. First, a purported public facility can qualify as a "public facility" if it shares common features with the other items listed in the recreation area waiver. *See St. Vrain Valley Sch. Dist. RE–1J v. A.R.L.*, 2014 CO 33, ¶ 22, 325 P.3d 1014 (utilizing the statutory canon *noscitur a sociis* to determine that an individual piece of playground equipment was fundamentally unlike the other items listed in the recreation area waiver and thus was not in and of itself a "public facility"). Second, a purported public facility can qualify as a "public facility" under the waiver if the legislative history provides strong evidence that the legislature intended it should qualify. *See Daniel v. City of Colo. Springs*, 2014 CO 34, ¶¶ 19–20, 327 P.3d 891 (concluding that a 1986 amendment to the recreation area waiver provided strong evidence of legislative intent that a parking lot located in a recreation area qualify as a "public facility"). Third, a purported public facility can so qualify if it is a component of a larger collection of items that promote a broader, common purpose. *See St.*

---

**6.** This particular situation would no longer represent a conflict, because the CGIA was amended in 1994 to include an exception to the correctional facility waiver for incarcerated inmates. *See*

Act of June 3, 1994, ch. 335, sec. 1, § 24–10–106(1.5)(a), 1994 Colo. Sess. Laws 2087, 2087 (codified at § 24–10–106(1.5)(a), C.R.S. (2013)).

*Vrain*, ¶ 21 (holding that an entire collection of playground equipment constituted a "public facility" because, although each individual piece of equipment promoted a specific play activity, together the equipment promoted the common purpose of children's play and recreation).

¶ 23 Here, our examination of legislative history reveals no evidence that the legislature intended to define a public facility as a walkway.[7] Accordingly, we also examine the statutory context and conclude that the walkway where C.Y.'s injury occurred does not in and of itself qualify as a "public facility," because it is fundamentally unlike the other items listed in the waiver. Lastly, we hold that the walkway is not a component of a "public facility"—i.e., it is not part of a collection of individual items that, when considered as a whole, promote a broader purpose. Our holding is further bolstered by the CGIA's objectives.[8]

### 1. The Walkway Is Not, In and of Itself, a "Public Facility"

 ¶ 24 The statutory context provides strong evidence that the walkway does not in and of itself qualify as a "public facility." Because the meaning of the term "public facility" in the recreation area waiver is ambiguous and because there is no relevant legislative history that can help us determine whether a walkway in and of itself qualifies as a "public facility," we turn to the statutory context and employ the interpretive canon *noscitur a sociis*. *See St. Vrain*, ¶¶ 16, 22 (concluding that the term "public facility" is ambiguous and employing *noscitur a sociis* to determine that an individual piece of playground equipment does not qualify as a "public facility"); *see also Hartsough*, 790 P.2d at

838 (implicitly applying *noscitur a sociis* in the CGIA context and explaining that "the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it"). Under *noscitur a sociis*, "a word may be known by the company it keeps." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 287, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010). Here, the company kept by the term "public facility" suggests that the legislature intended the term apply to larger, more permanent structures, because the term is grouped alongside public hospitals and jails, as well as public water, gas, sanitation, electrical, power, and swimming facilities. § 24–10–106(1)(e). Walkways are fundamentally different in size and permanence from the other items listed alongside the term "public facility" in the recreation area waiver. Unlike walkways, these other structures are generally enclosed by walls, equipped with doors and roofs, and more permanent in nature.[9]

 ¶ 25 We presume that the legislature "understands the legal import of the words it uses and does not use language idly, but rather intends that meaning should be given to each word." *Dep't of Transport. v. Stapleton*, 97 P.3d 938, 943 (Colo.2004). Accordingly, we conclude that the legislature's decision to include larger, more permanent structures than walkways in section 24–10–106(1)(e) expresses its intent that walkways do not qualify as public facilities. *See Beecham v. United States*, 511 U.S. 368, 371, 114 S.Ct. 1669, 128 L.Ed.2d 383 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."); *Hartsough*, 790

---

7. In some circumstances, we rely on legislative history in determining what qualifies as a "public facility" under the recreation area waiver. *See Daniel*, ¶¶ 19–20 (interpreting a legislative amendment to section 24–10–106(1)(e) specifically pertaining to public parking facilities in determining that a parking lot could qualify as a "public facility"). Here, however, there is no legislative history pertaining directly to walkways or otherwise illuminating whether a walkway should qualify as a "public facility."

8. Because we hold that the walkway here does not in and of itself qualify as a "public facility,"

nor does it qualify as a component of a "public facility," we need not address the remaining requirements of the waiver, as all requirements must be met for a waiver to apply.

9. In making this observation, we are not suggesting that enclosure by walls, doors or roofs is a requirement for qualifying as a "public facility." Indeed, we have held that a playground, *see St. Vrain*, ¶ 26, and a parking lot, *see Daniel*, ¶ 22, have qualified as public facilities, despite not containing these features.

P.2d at 838 (concluding that the term "public hospital" in another CGIA waiver provision, section 24–10–106(1)(b), did not apply to a public *veterinary* hospital because "public hospitals are grouped together [in the waiver] with correctional facilities and jails, strongly suggesting that the section was intended to apply to public facilities designed to hold people"). Construing the term "public facility" consistently with the other terms in the statutory framework, we thus hold that a walkway does not in and of itself qualify as a "public facility."

¶ 26 Although we have determined that a non-prototypical thing like a parking lot can qualify as public facility, *see Daniel,* ¶ 22 (holding that a parking lot qualifies as a "public facility"), the walkway here is distinguishable from the parking lot in *Daniel.* Significantly, in *Daniel,* we had strong indications from the legislative history that the legislature specifically intended that a parking lot be considered a "public facility." *Daniel,* ¶¶ 19–20. Moreover, the parking lot in that case was not a mere transit way but was specifically designed for the purpose of providing visitors with a convenient place to park their vehicles while using the golf course's amenities. *See id.* at ¶ 25. Additionally, the parking lot, which was built adjacent to the golf course, was intrinsically tied to recreation, because cars facilitate golfing by transporting visitors and their golf clubs to the golf course. *See id.* at ¶ 17. As further evidence of this intrinsic relationship to recreation, we also noted that the Colorado Springs Zoning Code explicitly tied the number of required parking spaces to the number of holes on the golf course. *Id.* at ¶ 29.

¶ 27 In contrast to the singular purpose of the parking lot in *Daniel,* the walkway at issue in this case was designed for multiple purposes, as indicated by its placement between the school and the playground. Although children did use the walkway as a means of accessing the playground, this was not the only purpose for which it was designed; rather, the walkway also served as a way to access the school and a way to traverse the school grounds more generally. Additionally, the link between recreation and the sidewalk here was far more attenuated. The walkway was not designed to promote a specific play activity. Although the walkway was adjacent to the playground, mere geographical proximity does not establish the same kind of intrinsic connection between the walkway and the recreational purpose of the playground as the connection between the parking lot and the recreational purpose of the golf course.

¶ 28 In sum, the walkway at issue was not, in and of itself, a "public facility" for the purposes of the recreation area waiver.

## 2. The Walkway Is Not a Component of a Larger "Public Facility"

¶ 29 Although the walkway fails to qualify as a "public facility," our analysis of the "public facility" requirement does not end there. An item that does not in and of itself qualify as a "public facility" may nonetheless be a component of a larger collection that is a "public facility," thereby allowing a plaintiff to meet the "public facility" requirement of the recreation area waiver. *See St. Vrain,* ¶ 21 (holding that the "public facility" requirement of the recreation area waiver was met even though an individual piece of public playground equipment was not itself a "facility," because the individual piece of playground equipment was a component of the broader "facility" that was the playground). Importantly, we only employ this component analysis when there is a *strong relationship* between the various individual components such that together they promote a broader, common purpose. *Id.* (explaining that individual pieces of playground equipment qualify as a "facility" because together they "collectively promote the common purpose of [children's] play"). Here, the walkway ran adjacent to the playground;[10] thus,

10. Although the walkway ran between the public school and the playground, our analysis is limited to whether the walkway was a component of the larger playground facility. The school is designed for educational purposes, whereas the playground is designed for recreational purposes. *See St. Vrain,* ¶ 31 (explaining that a school is designed for educational purposes and is therefore not part of a "putative recreational area"). Accordingly, only the playground can trigger the

we consider whether the walkway is a component of the playground facility as a whole.

¶ 30 Applying the component analysis here, we hold that the walkway where C.Y. was injured is not a component of the public facility that is the playground, because the walkway does not promote the broader, overall purpose of children's play in the same way that the individual components of a playground (e.g., a swing set or a sand box) do. Although a swing set and a sandbox are designed for specific play activities (i.e., swinging and playing in sand, respectively), together these individual components promote a common purpose—children's play on the playground—making them part of the broader playground "facility." In contrast to swing sets and sandboxes, a walkway is not designed to promote a specific play activity and therefore does not promote the common purpose of the playground.[11] Rather, the walkway functions as a designated path for schoolchildren, faculty, and other visitors to use when moving around the outside of the school for reasons that are in no way necessarily connected to the playground, such as accessing the school. The mere fact that children are capable of impromptu or incidental recreation on this walkway en route to and from recess does not, *ipso facto*, render it part of the collection of playground equipment that together qualifies as a "public facility." Accordingly, although the walkway is in close geographical proximity to the playground, it is not part of the larger collection of items that constitute the "public facility" that is the playground.

### 3. Our Interpretation of "Public Facility" is Consistent with Legislative Intent

¶ 31 Further, construing the recreation area waiver such that a walkway adjacent to a playground is neither in and of itself a "public facility," nor a component of a "public facility," is consistent with legislative intent. The CGIA was designed to specifically define—and thus limit—the circumstances when immunity is waived by public entities. *See* § 24–10–102 (providing that public entities are liable "only to such an extent and subject to such conditions as are provided by this article").

¶ 32 Indeed, the legislature has conducted a careful balancing act in crafting the CGIA; specifically, it sought to balance the competing interests of protecting the public fisc on the one hand and allowing a sufficient avenue for tort recovery on the other. *See id.* (noting that the legislature recognizes both that governmental immunity "is, in some instances, an inequitable doctrine" and that limitations on liability are necessary); *Jenks v. Sullivan,* 826 P.2d 825, 826–27 (Colo.1992), *abrogated in part for other reasons by Bertrand v. Bd. of Cnty. Comm'rs of Park Cnty.,* 872 P.2d 223, 227 (Colo.1994) (noting that the CGIA "must be construed to meet the legislative recognition that, while sovereign immunity sometimes produces unfair results, the necessities of providing essential public services and protecting taxpayers against excessive fiscal burdens are important considerations"). "This balance is for the legislature alone to reach." *Medina,* 35 P.3d at 453. Thus, we will not disrupt the legislature's intent by stretching the recreation area waiver to include a walkway, when the contextual clues offered in the statute point to its intent that a walkway not be considered a "facility." *See Gutierrez v. Ada,* 528 U.S. 250, 255, 120 S.Ct. 740, 145 L.Ed.2d 747 (2000) ("The maxim *noscitur a sociis,* ... while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to [a statute]." (quoting

"recreation area" requirement of section 24–10–106(1)(e).

11. In holding that this particular walkway was not a component of a "public facility," we do not imply that a walkway could *never* qualify as a component of a larger "public facility." If a *strong relationship* exists between the walkway and other recreational equipment such that together the walkway and equipment promote a broader, common purpose of recreation, such a walkway could so qualify. For example, a walking/running path that traverses a system of exercise equipment located at intervals along that path might have a strong enough relationship to the exercise equipment to render the walking path and the equipment together a "public facility."

*Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961))).

¶ 33 Nor is the walkway a component of the larger playground, because it does not promote the broader, common purpose of children's play; instead, it has multiple purposes, some of which have nothing to do with recreation, including accessing the school grounds. Thus, because C.Y. cannot meet the recreation area waiver's "facility" requirement, we hold that the District retains its immunity.[12]

## IV. Conclusion

¶ 34 We hold that the CGIA's waiver provisions listed in section 24–10–106(1)(a)–(h) are not mutually exclusive. Rather, because the waivers represent alternative avenues for exposing a public entity to tort liability, more than one waiver may be triggered and analyzed by the trial court depending on the factual circumstances in a given case. We therefore reverse the court of appeals' holding in part.

¶ 35 We also hold that C.Y. cannot meet the recreation area waiver's requirements, outlined in section 24–10–106(1)(e), because the walkway where C.Y. was injured does not in and of itself qualify as a "public facility," nor does the walkway qualify as a component of a "public facility." Because the other CGIA waivers are similarly inapplicable under these facts, we affirm the court of appeals' holding that the District retains its immunity from liability for C.Y.' s injuries, though for different reasons.

JUSTICE COATS concurs in part and concurs in the judgment, and JUSTICE EID joins in the concurrence in part and concurrence in the judgment.

JUSTICE COATS, concurring in part and concurring in the judgment.

¶ 36 Like the majority, I too believe the court of appeals erred in concluding that

having determined the inapplicability of the waiver for dangerous conditions caused by snow and ice on walks leading to a public building, it was relieved of considering the applicability of other waiver provisions of the Act; but like the majority, I too believe immunity was nevertheless not waived in this case, as asserted by the plaintiffs, for a dangerous condition of a "public facility located in any park or recreation area maintained by a public entity," *see* § 24–10–106(1)(e), C.R.S. (2013). Largely for the reasons outlined in my separate opinions in *Daniel v. City of Colorado Springs,* 2014 CO 34, ¶¶ 35–49, 327 P.3d 891 (Coats, J., concurring), and *St. Vrain Valley School District RE–1J v. A.R.L.,* 2014 CO 33, ¶¶ 38–44, 325 P.3d 1014 (Coats, J., dissenting), also announced today, however, I disagree with the majority's understanding of the term "public facility," as it appears in the Act, and I therefore decline to join the majority's rationale concerning the parks or recreation area waiver. Because I would nevertheless affirm, I concur in the judgment of the court.

¶ 37 As I indicated in my separate opinions in *Daniel* and *St. Vrain,* I consider it manifest that a "recreation area maintained by a public entity," just as a "park," refers only to those areas designated and maintained by a public entity *as a recreation area,* as permitted by statute or the provisions of the entity's own regulations governing the creation, operation, and maintenance of recreation areas. While a school district is statutorily authorized to operate parks and public recreational facilities open to public use, *see* §§ 29–7–102(1), –101(1)(g), C.R.S. (2013), there is no suggestion that the school or playground at issue in this case was created and maintained according to the dictates of those provisions, and in fact, the record strongly suggests the walkway in question was simply a component of a public school ground, providing ingress and egress for those working or matriculating at that public school. Because "public facility" appears and

---

12. Although we generally construe the CGIA's waiver provisions broadly, as they are in derogation of the common law, this rule only applies when a broad construction is consistent with legislative intent. *See Hartsough,* 790 P.2d at 838 (noting that despite the general rule of broad

construction in the CGIA context, it "remains true ... that our primary task in construing a statute is to determine and give effect to the intent of the legislature"). Because a broad construction is inconsistent with legislative intent, we do not construe the waiver broadly here.

has significance as a separate term in the Act only to the extent that the facilities in question are located in parks or recreation areas, it is therefore inconsequential whether the walkway in this case could in some sense be classified as a public facility. *See* § 24–10–106(1)(e).

¶ 38 Rather than even address the overriding consideration whether the facility in question is located in a park or recreation area, the majority literally ties itself in knots attempting to define "public facility" in a manner capable of reconciling its disparate conclusions concerning the walkway in this case, the parking lot in *Daniel,* and the zip line and playground in *St. Vrain.* In contradistinction to this unmanageable, amorphous (or perhaps multi-dimensional) definition, I believe (as I have indicated more fully in my separate opinions in those other cases) the structure and history of the Act clearly demonstrate that the term "facility" is used in the Act simply to distinguish man-made from natural objects, and that the term "public," with regard to public parks and recreation areas, is used to distinguish those facilities designed for the use and enjoyment of the public from those facilities benefiting the public only in the sense that they exist for the entity's operation and maintenance of the park or recreation area. Were it necessary to address the question at all, I would therefore find that the walkway in question is clearly a "facility," but that nothing in the record suggests it has been provided for the use and enjoyment of the public for recreational purposes.

¶ 39 Because I would affirm the judgment of the court of appeals but on different grounds from those articulated by either the court of appeals or the majority, I concur in part and concur in the judgment.

I am authorized to state that JUSTICE EID joins in this concurrence.