Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 24, 2017

**2017 CO 30**

**No. 15SC589, <u>Denver School District v. Denver Classroom Teachers Association</u>—
Innovation Schools Act—Innovation Plans—Public Schools.**

In this case, the supreme court considers whether the Innovation Schools Act of
2008, §§ 22-32.5-101 to -111, C.R.S. (2016), precludes a local school board from
approving an innovation plan submitted by a "new" innovation school, that is, a school
that has not previously opened as a non-innovation school and has yet to hire teachers.
The supreme court concludes that the Innovation Schools Act does not preclude
approval of innovation plans from such "new" innovation schools.  Accordingly, the
judgment of the court of appeals is reversed.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2017 CO 30**

**Supreme Court Case No. 15SC589**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 13CA1530

**Petitioners:**
City and County of Denver School District No. 1 in the State of Colorado and City and County of Denver School District No. 1 Board of Education,

v.

**Respondents:**

Denver Classroom Teachers Association, Denver Association of Educational Office Professionals, Lloyd Bourdon, Cheryl Myres, and Toni Falcon.

**Judgment Reversed**
*en banc*
April 24, 2017

**Attorneys for Petitioners:**
Zonies Law, LLC
Sean Connelly
 *Denver, Colorado*

Denver Public Schools
Molly Ferrer
 *Denver, Colorado*

**Attorneys for Respondents:**
Colorado Education Association
Sharyn E. Dreyer
 *Denver, Colorado*

**CHIEF JUSTICE RICE** announced the judgment of the Court and delivered an opinion, in which **JUSTICE BOATRIGHT** joins.
**JUSTICE EID** concurs in the judgment, and **JUSTICE COATS** joins in the concurrence in the judgment.
**JUSTICE GABRIEL** dissents, and **JUSTICE MÁRQUEZ** and **JUSTICE HOOD** join in the dissent.

¶1    This case requires us to determine whether the Innovation Schools Act of 2008 ("ISA"), §§ 22-32.5-101 to -111, C.R.S. (2016), precludes a local school board from approving an innovation plan submitted by a "new" innovation school, that is, a school that has not previously opened as a non-innovation school and has yet to hire teachers.[1] We hold that the ISA does not preclude approval of innovation plans from such "new" innovation schools. Accordingly, we reverse the judgment of the court of appeals and remand for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶2    Between 2010 and 2012, the Board of Education of School District No. 1 ("DPS Board") approved and implemented innovation plans at eleven schools under the ISA. Most of these schools were created to replace failing schools within the Denver Public Schools District ("DPS"). All of the schools were "new," in that they had not previously been opened as non-innovation schools and had new names, new identification numbers, and employed only a principal and, in some cases, one or two other administrative employees—but had no students, teachers, or other employees at the time their innovation plans were approved.

¶3    Six of the eleven schools at issue here are in the far northeast area of Denver. They were created to replace failing schools in that area, including the former Montbello High School. For example, at Montbello High School, only seven percent of

---

[1] We granted certiorari on the following issue:

> Whether the Innovation Schools Act, §§ 22-32.5-101 to -111, C.R.S. (2016), precludes new innovation schools, which were not previously opened as non-innovation schools, because section 104(3)(f) of the Act requires that innovation plans include information regarding teacher support.

entering freshmen graduated four years later with the ability to enroll in higher education without remediation, while a thousand students from the area opted for very long bus rides so they could attend DPS high schools outside the area.

¶4 In November 2010, after ten public meetings and a final hearing lasting until 2 a.m., pursuant to its authority to close schools, the DPS Board voted for phased-out closures of Montbello High School and the area's middle and elementary schools. See § 22-32-110(1)(l), C.R.S. (2016); Hawkins v. Cline, 420 P.2d 400, 403 (Colo. 1966). In their place, five new innovation schools were created to serve high school and middle school students: Denver Center for International Studies at Montbello 6–12, Collegiate Prep Academy, High Tech Early College, Vista Academy (focused on high-risk youth), and Noel Community Arts Program 6–12. A sixth innovation school, the Denver Center for International Studies at Ford, was created to serve elementary school children in the area.

¶5 Two of the other schools at issue here, West Generation Academy and West Leadership Academy, replaced West High School and the middle school operating on the West campus. These schools serve grades six through twelve on the former West High School campus. In 2011, the DPS Board approved phased-out closures of West High School and the middle school. The resolution approving these closures cited the failings of both: West "had declining enrollment" as well as "the lowest graduation rate and highest remediation rate of any of [DPS's] traditional high schools," while the middle school was "Accredited on Probation and the lowest rated school on the District's Performance Framework."

3

¶6 The final three new innovation schools challenged here are the Denver Center for 21st Century Learning at Wyman ("DC21"), Swigert International School, and McAuliffe International School. DC21 was designed to re-engage high-risk youth facing problems such as gang involvement, substance abuse, pregnancy, and truancy. Swigert and McAuliffe were created to address student population growth in Denver's Stapleton neighborhood.

¶7 After the DPS Board voted for phased-out closure of the old schools and the eleven new schools were created, the DPS Board approved the innovation plan for each new school. In 2011 and 2012, the State Board of Education ("State Board"), pursuant to section 22-32.5-107(3), unanimously designated these eleven new schools. Then, teachers and other employees were hired to work in the eleven schools. Next, in the first week that each school opened, as provided in section 22-32.5-109(1)(b), the faculty at each new school voted on whether to waive the collective bargaining agreement ("CBA") provisions identified in the innovation plans. Each of these secret-ballot votes resulted in far more than the requisite sixty percent support for the waivers of the CBA provisions. The teachers and staff at each school also voted on whether they supported their schools' innovation plan. The majority of teachers and staff at each school voted in support of each innovation plan.

¶8 The Denver Classroom Teachers Association, the Denver Association of Educational Office Professionals, Lloyd Bourdon, Cheryl Myres, and Toni Falcon (collectively, "the Association") brought suit to challenge the DPS Board's approval of the eleven new schools' innovation plans. The district court upheld the innovation

4

school designations except as to two schools in Stapleton—Swigert and McAuliffe—which it denied on the basis that those schools were not created "to address problems identified in chronically failing schools and failing student populations." The court ruled that section 22-32.5-104(3)(f), which states that an innovation plan shall contain evidence that a majority of teachers, administrators, and the school accountability committee consent to the designation as an innovation school, was "inapplicable" to the remaining nine schools, noting that teachers showed "their approval of the Innovation Plan by agreeing to work at the school and signing a contract of employment at the school, knowing it was operating under an Innovation Plan, with an extended school day and year, other provisions imposing higher demands on the teachers, and statutory and CBA waivers."

¶9    The Association appealed and argued that under section 104(3)(f), an innovation plan cannot be submitted to a local school board and the State Board without the prior majority consent of teachers, administrators, and the school accountability committee. In other words, it argued that an innovation plan could only be submitted by an existing non-innovation school and could not be submitted by a school that had yet to hire teachers. The court of appeals agreed with the Association and reversed the designations except as to Swigert and McAuliffe—for those, it upheld the denial of the innovation designations. Denver Classroom Teachers Ass'n v. Denver Sch. Dist. No. 1, 2015 COA 71, ¶ 68, __ P.3d __. DPS and the DPS Board appealed, and this court granted certiorari.

## II. Analysis

¶10 The crux of the question presented by this case is, simply, can a local school board approve a "new" school's innovation plan before the school hires teachers? We hold that it can. The General Assembly intended that the ISA give schools and school districts flexibility and autonomy to address the needs of students and the communities in which they live. Construing the ISA to preclude a local school board from approving innovation plans from "new" schools that had not previously opened as non-innovation schools and had yet to hire teachers would be directly contrary to this intent. Moreover, given this intent, we construe section 104(3)(f) to be directory and inapplicable to such "new" innovation schools. Accordingly, we hold that the ISA does not preclude a local school board from approving innovation plans from schools that have not previously opened as non-innovation schools and have yet to hire teachers.

### A. Standard of Review and Statutory Construction

¶11 We review issues of statutory construction de novo. Specialty Rests. Corp. v. Nelson, 231 P.3d 393, 397 (Colo. 2010). In interpreting a statute, our primary objective is to ascertain and effectuate the intent of the General Assembly. Id. In making this determination, we presume that the General Assembly intended a just and reasonable result, and we consider the consequences of a particular construction. Bd. of Cty. Comm'rs of Cty. of Park v. Park Cty. Sportsmen's Ranch, LLP, 45 P.3d 693, 711 (Colo. 2002). "Perhaps the best guide to intent is the declaration of policy which frequently forms the initial part of an enactment." St. Luke's Hosp. v. Indus. Comm'n, 349 P.2d 995, 997 (Colo. 1960).

¶12 Additionally, a "statute should be given the construction and interpretation which will render it effective in accomplishing the purpose for which it was enacted." Zaba v. Motor Vehicle Div., Dep't of Revenue, 516 P.2d 634, 637 (Colo. 1973). We also "read the statutory design as a whole, giving consistent, harmonious, and sensible effect to all of its parts." Young v. Brighton Sch. Dist. 27J, 2014 CO 32, ¶ 11, 325 P.3d 571, 576. But we should avoid constructions that lead to illogical or absurd results. Johnson v. People, 2016 CO 59, ¶ 18, 379 P.3d 323, 327.

## B. The Innovation Schools Act

¶13 The legislative declaration of the ISA explains that the General Assembly recognized a need to grant principals, faculty, and school districts the "maximum degree of flexibility possible to meet the needs of individual students and the communities in which they live." § 22-32.5-102(1)(d). The legislative declaration also explains that districts should "delegate to each public school a high degree of autonomy in implementing curriculum, making personnel decisions, [and] organizing the school day" (among other things)—"thereby empowering each public school to tailor its services most effectively and efficiently to meet the needs of the population of students it serves." § 22-32.5-102(1)(e).

¶14 To effectuate its purposes, the ISA created a system that allows a public school to submit an "innovation plan" to its local school board for approval. § 22-32.5-104(1)(a)–(b). The plan should describe the "innovations" the public school would like to implement, which may include changes to, among other things, the length of the school day and year, the curriculum, and teacher hiring and compensation.

7

§ 22-32.5-104(3)(b)–(c). If the local school board approves the plan, it may seek designation by the State Board as a district of innovation on the basis of the submitted plan or plans as the case may be. § 22-32.5-107(1).

¶15    Because submitted innovation plans may require changes that otherwise would be precluded by state statutes, district rules, and CBA provisions, designation by the State Board has the important consequence of relieving the designated innovation schools from a number of these restrictions. Specifically, upon designation, "the [S]tate [B]oard shall waive any statutes or rules specified in the school district's innovation plan" other than specified statutes not subject to waiver. § 22-32.5-108(1). However, if the innovation plan contains a provision that attempts to waive any CBA provisions, any such waiver will only be effective upon "obtaining the approval, by means of a secret ballot vote, of at least sixty percent of the members of the collective bargaining unit who are employed at the innovation school." § 22-32.5-109(1)(b).

¶16    In addition, section 104(3) gives specific direction about the contents of innovation plans. That section states, among other things, that plans must provide evidence that a majority of teachers employed at the school consent to designation as an innovation school. § 22-32.5-104(3)(f). However, the statute imposes no substantive restrictions on a local school board's authority to approve or disapprove innovation plans, § 22-32.5-104(1), and the State Board must designate for innovation unless a plan is likely to result in a decrease in academic performance or is not fiscally feasible, § 22-32.5-107(3)(a)(I)–(II).

## C. The Innovation Schools Act and "New" Schools

¶17    Nothing in the ISA precludes a local school board from approving an innovation plan from a school that has not previously been open as a non-innovation school and has yet to hire teachers (i.e., a "new" school). Yet, the Association argues that we should read such a preclusion into the ISA because, under its logic, a local school board cannot approve an innovation plan that fails to meet the requirements of section 104(3)(f). It argues that by specifically requiring the consent of teachers, section 104(3)(f) presumes the existence of an operating school, and as such, a local school board cannot approve an innovation plan from a school without teachers. However, section 104(3)(f) is far too slender a reed on which to base reading an implied preclusion into the ISA.

¶18    We must "read the statutory design as a whole" in order "to ascertain and give effect to the legislature's intent." Young, ¶ 11, 325 P.3d at 576. Rather than read any one statutory provision in isolation, we examine the provision in the context of the statute as a whole and strive to give consistent, harmonious, and sensible effect to all parts of the statute. Id. Thus, we can only read section 104(3)(f) in the overall context of the ISA and in light of the ISA's purposes. The clear purpose of the ISA is to allow schools and school districts the flexibility and autonomy to address the needs of students and the communities in which they live. See § 22-32.5-102(1)(a), (c)–(e). Thus, the ISA was intended as an empowerment of, not a restriction upon, local school districts. Construing section 104(3)(f) to preclude "new" innovation schools undercuts this intended empowerment and flexibility. If section 104(3)(f) precludes the creation of

9

"new" innovation schools, a school will be required to first open as a non-innovation school before it can submit an innovation plan. Such delay would be inimical to the interests of all students, especially to those from failing school districts, and contrary to the purposes of the ISA. Additionally, this would be a severe limitation on a local district's flexibility and is therefore out of line with the intent of the General Assembly.

¶19 Moreover, the State Board cannot legally deny innovation status to "new" schools simply because their innovation plans lack section 104(3)(f) information. See § 22-32.5-107(3)(a). Instead, the State Board is limited to reviewing only academic and fiscal issues. See § 22-32.5-107(3)(a)(I)–(II). Thus, a restrictive reading of 104(3)(f) leads to an illogical construction of the ISA, namely that section 104 would invalidate a local school board's approval of new schools, but section 107 would require the State Board to designate those "improperly" approved schools. This reading contravenes the requirement that courts construe statutes, wherever possible, to avoid these sorts of illogical results. See Johnson, ¶ 18, 379 P.3d at 327.

¶20 In any event, as applied to "new" schools, section 104(3)(f) is directory rather than mandatory. A "'directory' provision in a statute is one, the observance of which is not necessary to the validity of the proceeding to which it relates" and "involving no invalidating consequence for its disregard." Directory, Black's Law Dictionary (6th ed. 1990); see also Directory Statute, Black's Law Dictionary (10th ed. 2014) ("A law that indicates only what should be done, with no provision for enforcement."). The distinction between a "directory" and a "mandatory" provision—that is, whether noncompliance invalidates the action—turns on "legislative intent." Protest of

10

McKenna, 2015 CO 23, ¶ 19, 346 P.3d 35, 41. Section 104(3)(f)—which is silent as to the consequences of not providing the information and does not address how a school that lacks teachers, administrators, and/or a school accountability committee could possibly submit a valid innovation plan—cannot trump the broader purposes and intent of the statute: those of "preserving local flexibility" and providing the "maximum degree of flexibility" in "empowering each public school" to innovate. § 22-32.5-102(1)(a)–(e). Construing section 104(3)(f) as mandatory and implicitly prohibiting "new" innovation schools would defeat the ISA's manifest purposes of encouraging innovation and flexibility. Ultimately, then, the section 104(3)(f) informational provision is directory and inapplicable to plans involving "new" schools.

¶21 In sum, we hold that the ISA does not preclude a local school board from approving an innovation plan from a school that has not previously opened as a non-innovation school and has yet to hire teachers. Instead, a local school board can approve an innovation plan that does not include information discussed in section 104(3)(f).

### III. Conclusion

¶22 We hold that the ISA does not preclude a local school board from approving innovation plans from new innovation schools that have not previously opened as non-innovation schools and have yet to hire teachers. Accordingly, the judgment of the court of appeals is reversed as to all eleven new schools. We remand for further proceedings consistent with this opinion.

**JUSTICE EID** concurs in the judgment, and **JUSTICE COATS** joins in the concurrence in the judgment.

**JUSTICE GABRIEL** dissents, and **JUSTICE MÁRQUEZ** and **JUSTICE HOOD** join in the dissent.

JUSTICE EID, concurring in the judgment.

¶23     I agree with the Chief Justice that section 104(3)(f) of the Innovation Schools Act ("the Act") does not preclude the new innovation schools at issue in this case. I would reach that result on a narrower ground, however, and therefore concur only in the judgment the Chief Justice's opinion reaches.

¶24     Section 104(3)(f) states that an innovation plan "shall include the following information: . . . Evidence that . . . a majority of the teachers employed at the public school . . . consent to designation as an innovation school . . . ." The court of appeals concluded that "[a] new school's innovation plan . . . cannot meet the requirements of subsection 104 of the Act until the school has commenced operations and its plan has received the necessary majority consent[] from teachers . . . . As a result, . . . a new school that has neither teachers nor students cannot seek innovation status." Denver Classroom Teachers Ass'n v. City & Cty. of Denver Sch. Dist. No. 1, 2015 COA 71, ¶ 60, __ P.3d __. In other words, the court of appeals drew an inference from section 104(3)(f)'s reference to teachers' "consent" that the section imposes a requirement that a new innovation school actually have teachers before it may submit an innovation plan for approval; otherwise, the court appears to reason, there would be no teachers to consent to designation.

¶25     The Chief Justice observes that this inference "is far too slender a reed on which to base reading an implied preclusion" into the Act. C.J. op. ¶ 17. I agree. Section 104(3)(f) does not state that a school is required to have teachers before an innovation plan may be submitted. Instead, it refers to providing evidence that a majority of

1

teachers have consented to the designation. Therefore, when section 104(3)(f) is applied to a new innovation school that has no teachers, a majority of those teachers consenting to designation would simply be zero—as was the case here. The language of section 104(3)(f) mandates no more. Indeed, importing a new requirement into the language of section 104(3)(f) would be inconsistent with the General Assembly's expressly stated purpose in adopting the Act—namely, to grant the "maximum degree of flexibility possible to meet the needs of individual students and the communities in which they live." § 22-32.5-102(1)(d). Accordingly, the plans in question in this case comport with section 104(3)(f).

¶26 Because section 104(3)(f) is satisfied in this case, I would not find it necessary to address the consequences that might flow from noncompliance. Here I part ways with the Chief Justice's opinion, which goes on to hold that the State Board could not deny innovation status to new schools for noncompliance with section 104(3)(f), and that, in any event, section 104(3)(f) is merely directory, not mandatory. C.J. op. ¶¶ 19–20. If section 104(3)(f) is directory, it would seem that all of section 104(3) is directory, which would mean that an innovation plan could contain none of the information described in section 104(3) and still be considered an innovation plan. In my view, the language of the Act does not support this result. For these reasons, I respectfully concur only in the judgment reached by the Chief Justice's opinion.

I am authorized to state that JUSTICE COATS joins in this concurrence in the judgment.

JUSTICE GABRIEL, dissenting.

¶27 Relying on broad statements as to the intent of the Innovation Schools Act of 2008 ("ISA"), §§ 22-32.5-101 to -111, C.R.S. (2016), the Chief Justice's opinion holds, purportedly contrary to the court of appeals division below, that the ISA does not preclude a local school board from approving an innovation plan submitted by a "new" innovation school. C.J. op. ¶ 1.[2]

¶28 The division, however, did not hold that the ISA precludes a local school board from approving an innovation plan submitted by a "new" innovation school. Rather, the division rejected as contrary to the ISA the contention of the petitioners, Denver School District No. 1 and its board of education (collectively, "DPS"), that the General Assembly intended "new" innovation schools to be exempt from the ISA's pre-submission approval requirements. Denver Classroom Teachers Ass'n v. City & Cty. of Denver Sch. Dist. No. 1, 2015 COA 71, ¶¶ 41–42, ___ P.3d ___. The division then concluded that a public school or school district cannot develop an innovation plan without complying with the requirements of the ISA. Id. at ¶ 45.

¶29 Moreover, although the Chief Justice's opinion relies on what it views to be the intent of the ISA, in doing so, it all but ignores the pertinent provisions of that statute, which undermine the Chief Justice's conclusions.

¶30 Because (1) the plain language of section 22-32.5-104(3)(f) requires innovation plans to include evidence that a majority of the teachers and of the school accountability

_____

[2] For clarity and readability, I will sometimes use "Chief Justice" herein as shorthand for "Chief Justice's opinion."

1

committee ("SAC") of the school at issue have consented to the school's designation as an innovation school, (2) such approvals were not properly obtained here, and (3) the parties conceded at oral argument that such approvals could be obtained for "new" innovation schools, I respectfully dissent.

## I. Analysis

¶31 I begin by noting the applicable principles of statutory interpretation. I then address the pertinent provisions of the ISA. I conclude by applying the plain language of the ISA to the facts presented here and by explaining why I believe the Chief Justice's opinion is contrary to that statute.

## A. Standard of Review and Principles of Statutory Interpretation

¶32 We review de novo questions of law concerning the application and construction of statutes. Hickerson v. Vessels, 2014 CO 2, ¶ 10, 316 P.3d 620, 623. In interpreting statutes, we must give effect to the General Assembly's intent. Aetna Cas. & Sur. Co. v. McMichael, 906 P.2d 92, 97 (Colo. 1995). To discern this intent, we interpret statutory terms in accordance with their plain and ordinary meanings. Id. In addition, "we examine the statutory language in the context of the statute as a whole and strive to give 'consistent, harmonious, and sensible effect to all parts.'" Reno v. Marks, 2015 CO 33, ¶ 20, 349 P.3d 248, 253 (quoting Denver Post Corp. v. Ritter, 255 P.3d 1083, 1089 (Colo. 2011)). We will not add words to a statute, nor will we subtract words from it. Turbyne v. People, 151 P.3d 563, 567 (Colo. 2007). In the absence of ambiguity, we apply the statute's language as written. Id. If, however, a statute is ambiguous, then

2

we may consider the statute's purpose or policy, as well as its legislative history, to discern the General Assembly's intent. <u>McMichael</u>, 906 P.2d at 97.

## B. Pertinent Provisions of the ISA

¶33 When it enacted the ISA, the General Assembly declared, among other things, that parents should have input regarding their children's education and that the faculty employed at a school should have substantial flexibility in determining how to meet students' needs:

> (a) The constitutional provisions regarding the public education system direct the general assembly to establish a thorough and uniform statewide system of public education, but they also recognize the importance of preserving local flexibility by granting to each school district board of education the control of instruction in the schools of the school district;

> (b) The constitution's requirement that each school district board of education is responsible for controlling the instruction in its schools is based on the belief that the delivery of educational services must be tailored to the specific population of students they are intended to serve <u>and that the parents of those students should have great opportunity for input regarding the educational services their children receive</u>;

> (c) In tailoring the delivery of educational services, it is also important that the persons delivering those services, the principal of the public school <u>and the faculty employed at that school</u>, have the maximum degree of flexibility possible to determine the most effective and efficient manner in which to meet their students' needs.

§ 22-32.5-102(1)(a)–(c) (emphasis added).

¶34 To achieve these goals, section 22-32.5-104(1)(a) provides, "A public school of a school district may submit to its local school board an innovation plan as described in subsection (3) of this section."

3

¶35　Subsection (3), in turn, requires, among other things, that the innovation plan submitted to the local school board include evidence that a majority of both the faculty and the SAC consented to the submitted plan:

> (3) Each innovation plan, whether submitted by a public school or created by a local school board through collaboration between the local school board and a public school, shall include the following information:
>
> . . . .
>
> (f) Evidence that a majority of the administrators employed at the public school, a majority of the teachers employed at the public school, and a majority of the [SAC] for the public school consent to designation as an innovation school.

§ 22-32.5-104(3) (emphasis added).

¶36　The SAC's members include the principal of the school or the principal's designee and at least one teacher who provides instruction at the school; three parents or legal guardians of students enrolled in the school; one adult member of an organization of parents, teachers, and students recognized by the school; and one person who is involved in business or industry in the community. § 22-11-401(1)(a), C.R.S. (2016).

¶37　As the above-quoted legislative declaration makes clear, the pre-submission consent of a majority of the teachers at the school and a majority of the SAC is intended to ensure that (1) parents will have "great opportunity for input regarding the educational services their children receive" and (2) teachers at the school will have "the maximum degree of flexibility possible to determine the most effective and efficient manner in which to meet their students' needs." § 22-32.5-102(1)(b)–(c).

4

## C. Application

The material facts here are undisputed.

The innovation plans that were submitted to the local school board did not include the requisite evidence that a majority of the teachers employed by the schools at issue had consented to those plans. See § 22-32.5-104(3)(f). Nor did the plans include evidence that a majority of the SAC had consented to them. See id.

Moreover, as the parties conceded at oral argument, it was possible to comply with section 22-32.5-104(3)(f) and to obtain the requisite consents even for "new" innovation schools.

Accordingly, the plans submitted to the local school board here violated the plain language of the applicable provisions of section 22-32.5-104 of the ISA, namely, (1) section 22-32.5-104(1)(a), which authorizes schools to submit to the board "an innovation plan as described in paragraph (3) of [that] section," and (2) section 22-32.5-104(3)(f), which, in turn, required the plans to include the above-noted consents from the SAC and the teachers at the school. As a result, in my view, the local school board had no authority to approve such noncompliant plans, in direct contravention of the ISA's terms and stated purposes. See §§ 22-32.5-102(1)(a)–(c), 22-32.5-104(3)(f).

The Chief Justice nonetheless contends, or at least suggests, that (1) the foregoing interpretation of the ISA precludes "new" innovation schools, (2) section 22-32.5-104(3)(f)'s pre-submission consent requirements are merely informational, and (3) those requirements are "directory" and not "mandatory." See C.J. op. ¶¶ 18–20. I address these assertions in turn.

5

¶43 First, contrary to the Chief Justice's suggestion that the above-noted interpretation of the ISA conflicts with the General Assembly's intent by precluding "new" innovation schools, see C.J. op. ¶ 18, as noted above, both sides in this case conceded at oral argument that "new" innovation schools could obtain the requisite consents if necessary. Indeed, it is the Chief Justice's interpretation of the ISA, which allows schools to exclude teachers and parents from the plan development process, that contradicts both the ISA's expressed purpose and its obvious goal of fostering innovation through collaboration between and among all of the interested parties. See § 22-32.5-102(1)(a)–(c).

¶44 Second, I disagree with the Chief Justice's suggestion that section 22-32.5-104(3)(f) is merely informational. See C.J. op. ¶ 19. To the contrary, in my view, that provision is a substantive requirement that ensures that teachers and parents will have input into the innovation plan's development, precisely as the ISA envisions.

¶45 In this regard, I disagree with the Chief Justice's implicit view that pre-submission consent from teachers and parents is not required for "new" innovation schools because those schools do not yet exist and thus have no parents or teachers. Had the General Assembly wished to except from its pre-submission consent requirements "new" innovation schools, it could have done so expressly. But it did not, and in my view, such an omission was likely intentional because exempting "new" innovation schools from the ISA's pre-submission requirements would have undermined the collaboration between and among the school's administration, faculty, and parents that the ISA renders central to innovation schools.

¶46 I likewise disagree with DPS's assertion that the post hoc teacher approvals that were obtained here established substantial compliance with the ISA's pre-submission consent requirements. In determining whether strict or substantial compliance with a statute is required, we have considered both the objective that the legislation at issue seeks to achieve and any prejudice to the party against whom substantial compliance is asserted. See Woodsmall v. Reg'l Transp. Dist., 800 P.2d 63, 67–69 (Colo. 1990). Here, for the reasons noted above, the ISA expressly mandates teacher and parent involvement in the development of an innovation plan. See § 22-32.5-102(1)(b)–(c). Indeed, the statute provides that parents should have "great opportunity for input" regarding their children's education. See § 22-32.5-102(1)(b). Notwithstanding the foregoing requirements, in this case, the schools did not obtain the requisite teacher consent prior to submitting their innovation plans to the school board. Instead, the schools obtained after-the-fact consent from the teachers, apparently as a condition of employment. I perceive no basis for concluding that such post hoc teacher approvals established "substantial compliance" with section 22-32.5-104(3)(f). To the contrary, the schools' reliance on post hoc approvals allowed the schools to evade the pre-submission teacher involvement that the ISA requires.

¶47 And even if post hoc teacher approval could somehow be deemed sufficient to satisfy the teacher consent requirement of section 22-32.5-104(3)(f), DPS has not asserted—nor could it assert—substantial compliance as to the requirement of SAC consent. The SACs do not appear to have consented either before or after the plans' submissions to the school board. Accordingly, the undisputed facts reveal no

7

compliance—substantial or otherwise—with the requirement of pre-submission SAC consent.

¶48 Third, I am unpersuaded by the Chief Justice's assertion that section 22-32.5-104(3)(f)'s statement as to what an innovation plan "shall" include is "directory" rather than mandatory. C.J. op. ¶ 20. Although "shall" generally has a mandatory connotation, we have recognized that no bright-line test distinguishes mandatory from directory provisions. Protest of McKenna, 2015 CO 23, ¶ 19, 346 P.3d 35, 41. Thus, we have said that legislative intent controls. Id.

¶49 Here, I perceive nothing in the ISA or in its statement of legislative purpose to suggest that section 22-32.5-104(3)(f) was intended to be merely directory. Although the Chief Justice's opinion relies on its view of the ISA's overriding purpose of allowing flexibility in innovation, it overlooks the ISA's equally important goal of ensuring collaboration among and input from all interested parties, especially teachers and parents. In these circumstances, I cannot conclude that section 22-32.5-104(3)(f)'s provisions are merely directory.

¶50 In sum, the Chief Justice's opinion relies heavily on the purported intent of the ISA, to the exclusion of the plain language of that statute, which, in my view, contradicts the Chief Justice's conclusions. In doing so, the Chief Justice's analysis allows schools to avoid the ISA's requirements of parent and teacher involvement in developing an innovation plan, which, in turn, undermines the collaboration among all interested parties that is indispensable to innovation schools.

¶51 Had the General Assembly intended to create a "new" innovation school exception to the requirement of parent and teacher consent, it could easily have done so. But it did not, and I do not believe that it is this court's place to read into the statute an exception that is not there, no matter how expedient we might deem such an exception to be. See Turbyne, 151 P.3d at 567 (noting that we will not add words to a statute, nor will we subtract words from it).

## II. Conclusion

¶52 For these reasons, I respectfully dissent.

I am authorized to state that JUSTICE MÁRQUEZ and JUSTICE HOOD join in this dissent.