2015 CO 19

**Sara L. BURNETT, Petitioner**

v.

**STATE of Colorado DEPARTMENT OF NATURAL RESOURCES, Division of Parks and Outdoor Recreation, Respondent.**

**Supreme Court Case No. 13SC306**

Supreme Court of Colorado.

March 23, 2015

Rehearing Denied April 27, 2015

LLC, Timms R. Fowler, Fort Collins, Colorado

Attorneys for Respondent: Cynthia H. Coffman, Attorney General, Kathleen L. Spalding, Senior Assistant Attorney General, Denver, Colorado

Attorney for Amicus Curiae Colorado Trial Lawyers Association: Law Offices of John F. Poor, John F. Poor, Denver, Colorado

JUSTICE HOOD delivered the judgment of the Court.

¶1 In this case, we address whether the government waived its immunity for injuries petitioner Sara Burnett sustained when a tree limb fell on her as she camped below in a designated campsite in Cherry Creek State Park. The answer turns on whether the tree was a "natural condition of … unimproved property" under section 24–10–106(1)(e), C.R.S. (2014), of the Colorado Governmental Immunity Act ("CGIA"). If so, the government is immune from Burnett's lawsuit.

¶2 We hold that a "natural condition of any unimproved property" includes native trees originating on unimproved property. Because a limb from such a tree caused Burnett's injuries, the natural condition provision of section 24–10–106(1)(e) immunizes the government here.

## I. Facts and Procedural History

¶3 Located just southeast of Denver, Cherry Creek State Park ("the Park") encompasses 4,200 acres and includes more than thirty miles of multi-use trails for biking, hiking, and horseback riding. It also features 135 designated camping sites. The State of Colorado leases the land on which the Park is located from the U.S. Army Corps of Engineers. Despite various man-made attractions and amenities, many of the Park's naturally occurring features remain undisturbed. Among these features are several thousand trees that were on the property when the State established the Park in

Attorneys for Petitioner: Law Firm of Alan G. Molk, Alan G. Molk, Greenwood Village, Colorado, The Fowler Law Firm,

1959. Some of these trees border the campsite at issue in this case.[1]

¶ 4 The parties do not dispute the key facts giving rise to this case. On July 18, 2010, Burnett and her friend, Mackenzie Brady, went camping in the Park after they paid a fee to enter. The pair chose Campsite No. 14, which included a utility hookup, a parking area, a picnic table, and a level dirt pad. Burnett and Brady chose to pitch their tent on the dirt pad under the canopy of four mature cottonwood trees, reaching some seventy-five feet in height and flanking Campsite No. 14. The weather that night was uneventful.

¶ 5 Early the next morning, while Burnett and Brady remained asleep inside their tent, a tree limb dropped from one of the cottonwoods and struck both of them. The blow fractured Burnett's skull and a vertebra and caused other acute injuries, including a concussion and multiple lacerations to her scalp and face. Brady suffered only minor injuries and was able to drive Burnett to the hospital, where Burnett spent three days. Due to the density of the canopy, Park employees who subsequently investigated the campsite were unable to determine the source of the fallen tree limb.

¶ 6 Burnett brought a premises liability action against the State of Colorado Department of Natural Resources, Division of Parks and Outdoor Recreation ("the State") seeking compensation for her injuries. She relied on section 24–10–106(1)(e) of the CGIA, §§ 24–10–101 to –120, C.R.S. (2014), to argue that the Park was a "public facility" and the branches overhanging the campsite constituted a "dangerous condition" of it. *See* § 24–10–106(1)(e) (stating that a public entity waives immunity for injuries caused by a "dangerous condition of any ... public facility located in any park or recreation area maintained by a public entity"); *see also* § 24–10–103(5) (defining "public entity" to include "the state" and "every other kind of

... agency [or] instrumentality ... thereof").

¶ 7 The State moved to dismiss, asserting sovereign immunity under a separate provision of section 24–10–106(1)(e), by which a public entity retains immunity for "an injury caused by the natural condition of any unimproved property" ("the natural condition provision"). The parties subsequently stipulated that the improved campsite was a "public facility" but the trees adjacent to it originated on unimproved property.

¶ 8 The trial court determined that the "sole issue" was whether the trees adjacent to Burnett's campsite constituted a "public facility." In granting the State's motion to dismiss, the trial court conducted a two-part analysis to assess whether a pre-existing natural object, such as the tree, could be part of a "public facility." *See Rosales v. City & Cnty. of Denver*, 89 P.3d 507, 510 (Colo.App. 2004) (holding that a tree is part of a public facility "if a public entity incorporates [it] into a facility in such a manner that it [1] becomes an integral part of the facility and [2] is essential for the intended use of the facility"). The trial court held that the trees bordering Campsite No. 14 were not integral or essential to the campsite and thus could not constitute part of a "public facility" under section 24–10–106(1)(e).

¶ 9 In a split decision, the court of appeals affirmed the trial court's application of the two-part *Rosales* test, holding that the trees adjacent to the campsite (i.e. the public facility) were not integral to the facility or essential to its intended use. *Burnett v. State Dep't of Natural Res.*, 2013 COA 42, ¶ 9, —— P.3d ——. The court also held that because the trees were a "natural condition of ... unimproved property," section 24–10–106(1)(e) precluded Burnett's suit. *Id.* at ¶ 11.

¶ 10 We granted certiorari and now affirm in part the judgment of the court of appeals.[2]

1. The Park's mature trees provide a habitat for great horned owls and bald eagles. Whitetail and mule deer use the thick cover for bedding. Woodpeckers and northern flickers eat the insects that are inside the trees, and pheasants use the vegetation for cover and roosting.

2. We granted certiorari on the following reframed issue: "Whether the court of appeals erred in concluding that the government did not waive immunity under section 24–10–106(1)(e), C.R.S. (2013), of the Colorado Governmental Immunity Act for injuries caused by a tree limb that

## II. Standard of Review and Statutory Construction

¶ 11 Whether a governmental entity waives immunity under the CGIA is an issue of subject matter jurisdiction resolved under C.R.C.P. 12(b)(1). *Medina v. State*, 35 P.3d 443, 451–52 (Colo.2001). Where the facts are undisputed, as they are here, appellate review is de novo. *Id.* at 452–53. Because the CGIA derogates the common law, we strictly construe its grants of immunity and, in turn, broadly construe its waivers of immunity. *Id.* at 453 (citing *Corsentino v. Cordova*, 4 P.3d 1082, 1086 (Colo.2000)).

¶ 12 To resolve the case at hand, we must analyze section 24–10–106(1)(e)'s natural condition provision. The primary task in statutory interpretation is to determine and effectuate legislative intent by construing the statute as a whole, "giving consistent, harmonious, and sensible effect to all of the statute's parts." *St. Vrain Valley Sch. Dist. RE–1J v. A.R.L.*, 2014 CO 33, ¶ 10, 325 P.3d 1014, 1019. Where the statutory language is unambiguous, we give effect to the language's plain and ordinary meaning. *Id.* Where the statutory language is susceptible to more than one reasonable interpretation, it is ambiguous; in such cases, we may examine statements of legislative policy to determine legislative intent. *See id.* at 325 P.3d at 1019 (citing § 2–4–203(1), C.R.S. (2013) (noting that when statutory ambiguity exists, a reviewing court may consider, among other things, the object sought to be attained by the statute, the legislative history, the consequences of a particular construction, and the legislative declaration)).

## III. Analysis

¶ 13 The CGIA generally immunizes governmental entities and employees from tort liability but waives this immunity under limited circumstances. *See* § 24–10–106. The Act recognizes that governmental immunity is sometimes inequitable, but it also recognizes that governmental entities provide many essential services that unlimited liability could disrupt or make prohibitively expensive. *See* § 24–10–102. The balance between these two competing interests "is for the legislature alone to reach." *Medina*, 35 P.3d at 453.

¶ 14 Under section 24–10–106(1)(e), a public entity waives its immunity in an action for an injury arising from a "dangerous condition of any . . . public facility located in any park" it maintains. But a public entity retains immunity for injuries "caused by the natural condition of any unimproved property, whether or not such property is located in a park. . . ." *Id.*[3] Therefore, irrespective of what constitutes a public facility, the government retains immunity here if the tree at issue falls within the ambit of the natural condition of unimproved property limitation.

¶ 15 The CGIA does not define "natural condition of any unimproved property," and none of Colorado's appellate courts has interpreted this statutory language. The parties submit divergent interpretations of the provision and essentially debate where the improved property ends and the unimproved property begins.

¶ 16 Burnett broadly interprets the natural condition provision. Under her view, the trees were in their "natural condition" until the State altered the trees' condition through incidental maintenance. She also reads the provision to imply that there can be "natural" conditions of *improved* property. That is, because the State built the campsite subjacent to the trees, the State incorporated the trees into improved property. Thus, she argues, the trees ceased to be a natural condition of unimproved property.

¶ 17 The State takes a more restrictive view. It reasons that where trees are native flora to property, their character as a "natu-

fell on a camper in an improved campsite in a state park."

**3.** The paragraph states, in relevant part, that a public entity waives immunity for:
A dangerous condition of any . . . public facility located in a park or recreation area maintained by a public entity. . . . Nothing in this paragraph (e) . . . shall be construed to prevent a public entity from asserting immunity for an injury caused by the natural condition of any unimproved property, whether or not such property is located in a park or recreation area or on a highway, road, or street right-of-way.
§ 24–10–106(1)(e).

ral condition of unimproved property" persists irrespective of incidental maintenance or their proximity to improvements on the land. Thus, it argues, because the trees here are natural conditions that existed on unimproved property before the State built the campsite, the trees' mere presence and proximity to the campsite do not affect their status as natural conditions of unimproved property.

¶ 18 Both of these views present reasonable interpretations of the natural condition provision's plain language. Because the natural condition provision is therefore susceptible to alternative, reasonable interpretations, we conclude that the statutory language is ambiguous. We therefore look beyond the statute's plain language to ascertain and effectuate legislative intent.

¶ 19 We do so by first examining the legislative history of the natural condition provision and then applying the resulting principles to Burnett's case. After finding legislative intent to immunize the government, we also assess the two-part *Rosales* test used by the trial court and court of appeals. We overrule *Rosales*.

### A. Legislative History

¶ 20 In 1971, this court held that judicially imposed sovereign immunity was inappropriate and abolished such immunity at every level of government. *Evans v. Bd. of Cnty. Comm'rs*, 174 Colo. 97, 482 P.2d 968, 972 (1971); *Flournoy v. Sch. Dist. No. 1*, 174 Colo. 110, 482 P.2d 966, 967 (1971); *Proffitt v. State*, 174 Colo. 113, 482 P.2d 965, 966 (1971). The next year, the General Assembly enacted the CGIA to reestablish governmental immunity, excepting a finite number of specific circumstances in which public entities waive immunity. Before adopting the Act, a Legislative Council committee to the General Assembly researched governmental immunity and assembled its conclusions in a 156–page report, *Colo. Legislative Council, Report to the Colorado General Assembly: Governmental Liability in Colorado*, Re-

search Publication No. 134, iii (1968) ("Report"), to assist in developing immunity legislation.

¶ 21 The *Report* summarizes the origins, purposes, criticisms, and trends of sovereign immunity and discusses policy considerations relevant to the substantive law, procedural handling, and financial administration of governmental tort liability claims. *Id.* at ix–xii. The *Report* includes a proposed bill, much of which remained unchanged in the version the General Assembly adopted. *Compare Report*, at xxvii–lii, *with* House Bill 71–1047, 1971 Laws 1204–18; *see also Daniel v. City of Colo. Springs*, 2014 CO 34, ¶ 37, 327 P.3d 891, 901 (Coats, J., concurring) ("[T]he basic structure and terminology of the proposed bill were retained [in the enacted legislation].").

¶ 22 In 1986, as a consequence of excessively high municipal insurance rates, the General Assembly substantially amended the CGIA to afford the government greater protection against liability. *See Daniel*, 327 P.3d at 901 (citing Chuck Berry & Tami Tanoue, *Amendments to the Colorado Governmental Immunity Act*, 15 Colo. Lawyer 1191 (1986)); *City of Aspen v. Meserole*, 803 P.2d 950, 952 (Colo.1990). Although the current version of the CGIA has changed over the past four decades, the portions relevant here remain largely the same.

¶ 23 The *Report* elucidates the legislative intent underlying the natural condition provision in at least four ways: first, it distinguishes between dangerous conditions arising from man-made and natural objects; second, it suggests that immunity turns on the precise mechanism of the injury; third, it expresses a clear intent to exempt public entities from a duty to maintain any natural conditions; and finally, its stated policy goals include encouraging public entities to open up to the public unimproved, government-owned property without exposing the entities to the burden and expense of defending claims brought by individuals who are injured while using the property.[4]

---

4. While we rely extensively on legislative history in resolving this case, we do not mean to suggest that such extensive reliance is always appropriate. Legislative history is only one way to gauge

legislative intent. The legislative history here is particularly instructive because it speaks to the specific circumstances of this case. In some cases with greater ambiguity in the historical

¶ 24 Based on the *Report*, we conclude that the legislature intended to retain immunity for injuries caused by native trees originating on unimproved property regardless of their proximity to a public facility, such as the improved area of the campsite here.

### 1. Man-Made vs. Natural Objects

¶ 25 First, the *Report* distinguishes between injuries caused by two types of dangerous conditions—those arising from man-made objects and those arising from natural objects: "For injuries caused by *natural dangerous conditions*, immunity should be retained.... [T]his means that sovereign immunity does not apply with respect to man-made objects and does apply to *natural objects.*" *Report*, at 140–41 (emphasis added); *see also Daniel*, ¶ 42, 327 P.3d at 903–04 (observing that the *Report* distinguishes man-made objects from natural conditions of property). This dichotomy between man-made and natural objects suggests that the natural condition provision governs any injuries arising from naturally occurring features of parks without consideration of their proximity to man-made objects. *Accord Rendak v. California*, 18 Cal.App.3d 286, 95 Cal.Rptr. 665, 667 (1971) ("[I]mprovement of a portion of a park area does not remove the immunity from the unimproved areas.").

¶ 26 The *Report* also specifically mentions "natural conditions of *a park* (the Flat Irons in Boulder or the Red Rocks west of Denver)." *Report*, at xxi (emphasis added). This indicates that the General Assembly intended the natural condition provision to retain vitality as applied to partially developed state parks.

### 2. Mechanism vs. Location

¶ 27 Second, the *Report* states that immunity should turn on the precise mechanism of the injury rather than the plaintiff's location when the injury occurred:

> The committee concluded that a distinction should be made between (1) injuries *caused by* negligence in the construction, maintenance, failure to maintain, etc. of artificial, man-made objects (swing sets, buildings, etc.) and (2) injuries *caused by* the natural conditions of a park.... In other words, ordinary negligence is sufficient [sic] to impose liability for injuries caused by the dangerous condition of artificial objects. *For injuries caused by natural dangerous conditions, immunity should be retained.*

*Id.* at 140 (emphasis added). That is, immunity turns on whether the injury was caused by negligence in the construction or maintenance of a man-made object or by a dangerous natural condition.

¶ 28 Another portion of the *Report* reinforces this point when it assigns to the public the risk of injury from dangerous natural conditions: "In view of the limited funds available for the acquisition and improvement of property for recreational purposes, ... it is not unreasonable to expect persons who voluntarily use unimproved property in its natural condition to assume the risk of injuries *arising therefrom.*" *Id.* at xxi–xxii (emphasis added). The *Report* states that individuals assume the risk of injuries *arising from* unimproved property in its natural state. Nothing in the *Report* suggests that a person's location on a man-made improvement shifts to the State the risk of injuries caused by dangerous natural conditions.

¶ 29 Courts in other jurisdictions have also relied on a causal analysis to conclude that the exact mechanism of a plaintiff's injury, not her location at the time of injury, determines immunity. In *Meddock v. County of Yolo*, 220 Cal.App.4th 170, 162 Cal.Rptr.3d 796, 799 (2013), the plaintiff argued that because he was on improved property—a paved parking lot—and using it as intended when a tree adjacent to the lot fell on him, the county waived its governmental immunity. In interpreting a provision nearly identical to our natural condition provision, the California Court of Appeal rejected the plaintiff's argument and held, "[A]lthough the injury *occurred* on improved property, that is, the paved parking lot, it was *caused by* the trees, native flora located near—and perhaps superjacent to—the improved parking lot, but themselves on unimproved property." *Id.* at 800–01 (footnote omitted). The court con-

record, the use of legislative history may not be the most analytically sound approach.

cluded that the plaintiff's spatial analysis reads "caused by" out of the statute. *Id.* at 801 ("Proximity may *inform* causation, but is no substitute therefor.").

¶ 30 In *Redinger v. Clapper's Tree Service Inc.*, 419 Pa.Super. 487, 615 A.2d 743, 748 (1992), the court also interpreted a comparable immunity waiver. It held that the plaintiff's injury did not arise out of an improvement to the land but was "caused by a falling, decayed tree limb" and "this limb came from a part of [defendant]'s land which remained unimproved." *Id.* at 750. It also noted, significantly, that "the fact that the land in question was a partially developed ... tract is of no consequence; unimproved portions of it may still come under the liability limitation of the [statute]." *Id.*

¶ 31 These courts' holdings lend support to our conclusion that a causal analysis should control immunity here.

### 3. Maintenance of Unimproved Property

■ ¶ 32 Third, the *Report* expresses a clear intent to exempt public entities from liability for failing to maintain natural conditions:

> If a facility is constructed or built, it must be maintained at the risk of being liable for a failure to do so. *If there is property which was not constructed, but is natural and unimproved, a public entity is not required to maintain it* and cannot be held liable for failure to maintain it. In this case, sovereign immunity is applicable.

*Report*, at 140–41 (emphasis added). Accordingly, we conclude that section 24–10–106(1)(e) does not create a duty to maintain natural features, nor does a duty arise merely because of the features' proximity or contiguity to improved property.[5]

¶ 33 Furthermore, even where the State chooses to maintain unimproved property to

protect the public health and safety, it does not assume a duty to maintain the property where none otherwise existed. *See* § 24–10–106.5(1) (stating that a public entity does not "assume[ ] a duty of care where none otherwise existed by the performance of a service"). Such a policy "encourage[s] the provision of services to protect the public health and safety" and "allow[s] public entities to allocate their limited fiscal resources." *Id.*

### 4. Balancing Safety and Access to Public Land

¶ 34 Fourth, the *Report* highlights the policy reasons underlying the CGIA and the natural condition provision. The primary concern in implementing the CGIA was to provide the public with a sufficient avenue to tort recovery without exhausting governmental resources—namely, the public fisc—through excessive exposure to tort liability. *See Report*, at xxi; *see also Young v. Brighton Sch. Dist. 27J*, 2014 CO 32, ¶ 32, 325 P.3d 571, 581 ("[T]he legislature has conducted a careful balancing act in crafting the CGIA; specifically, it sought to balance the competing interests of protecting the public fisc on the one hand and allowing a sufficient avenue for tort recovery on the other."). The CGIA avoids exposing governmental entities to liability that would "disrupt" or "make prohibitively expensive" the essential public services and functions that the entities provide. § 24–10–102.

¶ 35 Indeed, the *Report* expressly warns against subjecting public entities to liability where injuries arise from natural conditions: "[I]f immunity were waived with respect to injuries caused by the natural condition of any unimproved property[,] the burden and expense of putting such property in a safe condition and the expense of defending claims for injuries would probably cause many entities to close such areas to public use." *Report*, at xxi. It is clear from this

---

5. Our decision today does not contravene our holding in *City of Colorado Springs v. Powell*, 48 P.3d 561, 566 (Colo.2002). There, we held that the city had a duty to maintain the natural features adjacent to a drainage facility because the features affected the facility's overall condition. *Id.* We reached this holding, however, under a different CGIA section, 24–10–106(1)(f), which

waives a public entity's immunity for injuries resulting from the "operation and *maintenance*" of the enumerated facilities. *Id.* at 567. We expressly held, "A failure to maintain is within the scope of the operation and maintenance provision." *Id.* Because paragraph (e) does not impose such a maintenance duty, *Powell* is distinguishable from the case at hand.

language that the General Assembly intended to encourage governmental entities to open primitive, government-owned property to the public by limiting the entities' exposure to liability from individuals who choose to use the property.

¶ 36 Based on these portions of the CGIA's legislative history, we hold that the General Assembly intended a "natural condition of . . . unimproved property" to include native trees originating on unimproved property.

## B. Application

■ ¶ 37 Burnett asserts that: (1) the trees were located on improved rather than unimproved property because the State built and situated Campsite No. 14 subjacent to the trees; (2) her injury occurred on improved property while she was using the campsite as intended, thereby rendering the natural condition provision inapplicable; and (3) the trees bordering Campsite No. 14 were no longer in their natural condition because the Park had previously pruned them. The State argues that because a branch from trees originating on unimproved property caused Burnett's injuries, the natural condition provision precludes her suit. We agree with the State.

¶ 38 The natural condition provision's legislative history unequivocally manifests the General Assembly's intent to distinguish between injuries caused by man-made objects (for which immunity is waived) and those caused by natural objects (for which immunity is retained). Burnett erroneously reads a third possibility into the statute: the State waives immunity for injuries caused by natural objects that are contiguous to improved property. We are not at liberty to create this third category.

¶ 39 Furthermore, nothing in the legislative history indicates that the General Assembly intended the spatial analysis for which Burnett advocates. Her conclusion that a public entity waives immunity for injuries that are caused by natural conditions and occur on improved property creates a literal line drawing problem. This approach would require us to adopt an arbitrary rule to determine when natural objects, such as trees, sit on improved property and when they do not. For instance, if a falling tree limb injures two campers standing side-by-side in the same campsite but on either side of the imaginary boundary, one camper could establish an immunity waiver while the other could not. The legislative history does not support such an approach, and the canons of statutory interpretation militate against such an amorphous standard. *See People v. Cross*, 127 P.3d 71, 74 (Colo.2006) ("We . . . consider the consequences of a particular construction and avoid constructions that produce illogical or absurd results." (citations omitted)).

¶ 40 Because the *Report* and the statutory text state that immunity is retained for injuries *"caused by* a natural condition of . . . unimproved property," we conclude that immunity turns on the mechanism of Burnett's injuries, not her location when the injuries occurred.[6] The record shows the cottonwoods bordering Campsite No. 14 were native vegetation of the unimproved property. The branch at issue fell from one of those cottonwoods. Thus, Burnett's injuries were caused by a natural condition of unimproved property, such that the natural condition provision precludes her suit.

---

**6.** Burnett relies on several cases to argue that an entity waives immunity when a maintenance failure allows objects to intrude upon or interfere with a public facility and cause an injury thereon. *See State v. Moldovan*, 842 P.2d 220, 225 (Colo.1992) (holding that the government waived immunity for failing to repair a damaged fence that allowed a cow to wander onto a roadway); *Medina*, 35 P.3d at 448–49 (remanding to determine if the government waived immunity for failing to secure boulders above road); *Belfiore v. Colo. State Dep't of Highways*, 847 P.2d 244, 246 (Colo.App.1993) (holding that the government waived immunity for failing to secure boulders above road); *Schlitters v. State*, 787 P.2d 656, 658 (Colo.App.1989) (same). These cases do take location into account. However, they are inapposite because they involve section 24–10–106(1)(d), which states, in pertinent part, that a public entity waives immunity for injuries resulting from "[a] dangerous condition of a public highway, road, or street *which physically interferes with the movement of traffic on the paved portion*." (Emphasis added.) Paragraph (e) does not carve out a waiver for conditions that "physically interfere" with the use of the enumerated public facilities. Consequently, Burnett's interference argument fails.

¶ 41 In reaching this holding, we necessarily reject Burnett's argument that the State altered the natural condition of the trees by having previously pruned them. Under the CGIA, the State did not have any duty to prune the limbs, nor did it assume a duty to continue to prune them once it chose to do so. *See* § 24–10–106.5(1). An assumed duty would be contrary to the public health and safety, as it would discourage the State from undertaking any pruning whatsoever. We decline to create a rule under section 24–10–106(1)(e) that would transform natural conditions of unimproved property into improved property where, for the public health and safety, a public entity performs such incidental maintenance.

¶ 42 Our analysis is consistent with the legislature's policy goals. To make the State a guarantor of the public's safety from dangerous natural conditions of this sort would discourage it from opening and improving park lands for the public to enjoy. Neither the State's limited maintenance of some unimproved portions of the Park, nor its construction of structures nearby eliminated the governmental immunity intended by the legislature.

¶ 43 Because a natural condition of unimproved property caused Burnett's injuries, we conclude that the State is immune from suit under the natural condition provision of section 24–10–106(1)(e).

### C. *Rosales* Is Overruled

¶ 44 In analyzing whether the trees here constituted a "public facility" under section 24–10–106(1)(e), the trial court and court of appeals relied upon the two-part analysis delineated in *Rosales*. The test asks, first, was the tree an "integral" part of the public facility? *Rosales*, 89 P.3d at 510. And, second, was the tree "essential" for the public facility's intended use? *Id.* Because these questions do not originate in the CGIA, we overrule *Rosales*.

¶ 45 The facts in *Rosales* resemble those in this case. There, a tree branch fell on and injured the plaintiff while she was picnicking in a Denver city park. *Id.* at 508. She brought an action pursuant to section 24–10–106(1)(e), alleging that the city and county created a dangerous condition by failing to maintain the tree above the picnic table. *Id.* The court of appeals rejected the plaintiff's argument that the tree itself constituted a public facility but held nonetheless that "if a public entity incorporates a tree into a facility in such a manner that it becomes an integral part of the facility and is essential for the intended use of the facility, the tree may be a component of the public facility." *Id.* at 510.

¶ 46 By expanding the definition of "public facility" to incorporate natural objects, *Rosales* impermissibly narrows the circumstances in which public entities, particularly those operating parks and recreation areas, retain immunity for injuries caused by dangerous natural conditions. We implicitly rejected this expanded definition of "public facility" in *St. Vrain* when we held that " 'facility' applies to permanent, bricks-and-mortar structures ... as well as to collections of individual items that, considered together, promote a broader, common purpose." *St. Vrain*, ¶ 19, 325 P.3d at 1021. Because *Rosales's* holding is inconsistent with the language of the CGIA, the policy objectives in the *Report,* and our holding in *St. Vrain,* we overrule it.

### IV. Conclusion

¶ 47 Burnett's injuries are tragic, but eliminating governmental immunity in this case would only compound the tragedy by sidestepping legislative intent and providing a disincentive for the government to facilitate access to public lands.

¶ 48 We hold that a "natural condition of any unimproved property" includes native trees originating on unimproved property. Because a limb from such a tree caused Burnett's injuries, the natural condition provision of section 24–10–106(1)(e) immunizes the State. We therefore affirm in part the judgment of the court of appeals.

JUSTICE EID concurs in the judgment.

JUSTICE HOBBS dissents, and CHIEF JUSTICE RICE and JUSTICE MÁRQUEZ join in the dissent.

JUSTICE EID, concurring in the judgment.

¶ 49 Section 24–10–106(1)(e) of the Colorado Governmental Immunity Act ("CGIA") retains immunity for injuries "caused by the natural condition of any unimproved property." § 24–10–106(1)(e), C.R.S. (2014). Here, there appears to be no dispute that Burnett's injury was "caused" by a tree limb, and that the tree limb was a "natural condition." Thus, the narrow issue presented by this case is whether the tree limb was a natural condition "of unimproved property." I would give the phrase "of unimproved property" its plain and ordinary meaning that focuses on the origin of the natural condition. As applied here, the tree limb was part of a tree whose origin was unimproved property, and, accordingly, Burnett's injury falls within the immunity provided by section 24–10–106(1)(e). Although the plurality reaches the same result, it does so by focusing almost exclusively on the statute's legislative history. Because I would focus on the text, I concur only in the result reached by the plurality.

¶ 50 The plurality begins with the proposition that the phrase "natural condition of any unimproved property" is ambiguous because it is "susceptible to alternative, reasonable interpretations." Plur. op. ¶ 18. It then proceeds to analyze the case almost entirely by virtue of the statute's legislative history. Id. at ¶¶ 20–36. Yet the plurality identifies no particular ambiguity in the language, nor does it suggest that the legislative history enlightens its understanding of any particular language. While a statute's legislative history may be an aid to interpreting a statute's language, see § 2–4–203(1)(c), C.R.S. (2014), it is not the thing that is to be interpreted in and of itself. See, e.g., Shannon v. United States, 512 U.S. 573, 583, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (declining to require jury instruction that was "endorsed" in legislative history but not "anchored in the text of the statute").

¶ 51 There appears to be no dispute that the tree limb that "caused" Burnett's injury was a "natural condition." The only issue, then, is whether it was a natural condition "of unimproved property." I would give the phrase "of unimproved property" its plain and ordinary meaning—that is, a natural condition is "of unimproved property" when it originates from unimproved property. See Ceja v. Lemire, 154 P.3d 1064, 1066 (Colo. 2007) (applying the "plain and ordinary meaning" of CGIA terms); Merriam–Webster Collegiate Dictionary 806 (10th ed. 1995) (defining "of" to mean "used as a function word to indicate origin or derivation"). Thus, in my view, there is no ambiguity in the language; the only issue is how that language applies to the facts of the case. And, under the facts of this case, the tree was "of" unimproved property because it originated from unimproved property.

¶ 52 There is no question that the tree's trunk was located on the portion of property that was unimproved. Moreover, there is no dispute that the campsite was built adjacent to the tree. Burnett argues that because the state improved property adjacent to the tree by building a campsite, the tree was no longer "of unimproved property." But the campsite did not change the location of the tree, which remained on unimproved property. This is true even though many of the tree's branches may have hung over the campsite. Thus, this case is analogous to the California case of Meddock v. County of Yolo, where, in applying language nearly identical to the Colorado statute, the court concluded that the plaintiff could not recover for injuries caused by a falling tree where "the trees [were] located near—and perhaps superjacent to—the improved parking lot [where the plaintiff was standing], but themselves on unimproved property." 220 Cal.App.4th 170, 162 Cal. Rptr.3d 796, 800 (2013). I also agree with the Meddock court's implicit holding that under the statutory language it is the origin of the natural condition that caused the injury, rather than the plaintiff's location, that controls the immunity inquiry. See id.

¶ 53 The plurality reaches the same conclusion that "native trees originating on unimproved property" constitute a "natural condition of . . . unimproved property" under section 24–10–106(1)(e), but does so "[b]ased on . . . the CGIA's legislative history." Plur. op. ¶ 36. It seems to justify its "extensive reliance" on the legislative history on the

ground that here, unlike the average case, the history is "particularly instructive." *Id.* at ¶ 23 n. 4. However, I know of no case in which we have held that "particularly instructive" legislative history may serve as a substitute for a close analysis of the text. Because I would reach the plurality's result using the text of the statute, I concur only in its judgment.

JUSTICE HOBBS, dissenting.

¶ 54 This case presents the first opportunity for this court to define the contours of the Colorado Governmental Immunity Act's "natural condition of unimproved property" exception to the recreation area waiver. In light of our duty to narrowly construe grants of immunity and broadly construe waivers of immunity, I conclude that the natural condition of unimproved property exception in section 24–10–106(1)(e), C.R.S. (2014), does not apply in this case. The plurality and concurrence, in my view, incorrectly invoke this exception. Accordingly, I respectfully dissent.

¶ 55 The plain language of the CGIA shields the government from liability for injuries "caused by the natural condition of any unimproved property." § 24–10–106(1)(e). If there had not been an improved campsite under the cottonwood tree branch that injured Burnett, the branch would have been a natural condition of unimproved property. But once the State built the improved campsite in that location, that branch was no longer a natural condition of unimproved property, and thus the exception does not apply. Under these facts, the State's location of the campsite and, in particular, the tent pad under the cottonwood branches, gives rise to a claim of liability for a dangerous condition of a public facility that the natural condition of unimproved property exception does not excuse.

## I.

### A. Standard of Review

¶ 56 The plurality recites our mandate to narrowly construe the CGIA's immunity provisions in the interest of compensating victims of governmental negligence but then

proceeds to pay this rule of construction no heed. Because the legislature enacted the CGIA in derogation of common law, we narrowly construe its immunity provisions and, as a logical corollary, broadly construe its waiver provisions. *Daniel v. City of Colo. Springs,* 2014 CO 34, ¶ 13, 327 P.3d 891, 895; *St. Vrain Valley Sch. Dist. RE–1J v. A.R.L.,* 2014 CO 33, ¶ 12, 325 P.3d 1014, 1019; *Young v. Brighton Sch. Dist.,* 2014 CO 32, ¶ 13, 325 P.3d 571, 576. We must interpret section 24–10–106(1)(e)'s immunity waiver and natural condition exception according to these principles.

### B. Statutory Language

¶ 57 Contrary to the plurality opinion, which rests upon ambiguous and inconclusive legislative history, we should base our decision in this case on the plain language of the statute. Section 24–10–106(1)(e) contains both a waiver of immunity and an exception to that waiver:

*Sovereign immunity is waived by a public entity in an action for injuries resulting from ... [a] dangerous condition of any* public hospital, jail, *public facility located in any park or recreation area maintained by a public entity,* or public water, gas, sanitation, electrical, power, or swimming facility. *Nothing in this paragraph ... shall be construed to prevent a public entity from asserting sovereign immunity for an injury caused by the natural condition of any unimproved property, whether or not such property is located in a park or recreation area ....*

(Emphasis added.)

¶ 58 The exception the plurality and concurrence invoke to shield the State from liability in this case plainly applies to injuries "caused by the natural condition of any unimproved property." § 24–10–106(1)(e). Invocation of this exception ignores the stipulated facts before us. The parties agreed that Burnett's improved campsite was a "public facility" within the meaning of the CGIA's recreation area waiver. Among other improvements, the campsite contained electric, water, and sewer connections; a concrete parking pad; a level dirt tent pad; a picnic table; and a fire pit. If the State had not

built an improved campsite under the branch that crashed upon Burnett's tent, the branch would have been a natural condition of unimproved property. But once the State built the improved campsite, that branch was no longer a natural condition of *unimproved* property; it became a natural condition of *improved* property, and thus the exception does not apply.

¶ 59 Under these facts, the plurality and concurrence improperly truncate Burnett's opportunity to establish her claim. Burnett should be allowed to prove that the tree branches overhanging her campsite constituted a dangerous condition of a public facility. *See, e.g., City of Colo. Springs v. Powell,* 48 P.3d 561, 566 (Colo.2002) ("[A]reas immediately surrounding a facility often affect the overall condition of the facility."). By installing the campsite improvements, the State also assumed the responsibility of keeping those improvements safe from dangerous conditions. The State built the improved campsite for the purpose of overnight camping, and it must maintain the site to ensure it is suitable for that use.[1]

¶ 60 By determining that a "natural condition of any unimproved property" includes "native trees originating on unimproved property," plur. op. ¶ 36, the plurality and concurrence separate the trunk of a tree from its roots and branches, as they separate the General Assembly's intent from its moorings. Where a falling tree branch injures someone using a public facility, the location of that tree's *trunk* should not control the outcome. A tree originates from its roots. If the facts of a particular case show that a tree's root structure lies beneath an improved campsite, shouldn't that establish—under the plurality and concurring opinions' own reasoning—that the tree "originates" on improved property, and therefore take it out of the ambit of the natural condition exception?

¶ 61 We should respect the balance the General Assembly struck between providing access to public land and protecting the public fisc by finding a waiver of immunity in this case. *See* plur. op. ¶ 34; *see also* § 24–10–102, C.R.S. (2014) ("Declaration of policy"). Exposing the State to liability here would not lead to excessive liability. Under the waiver of immunity, the government is only responsible for reasonable risk management of dangerous conditions of public facilities, whether or not those dangerous conditions arise from natural objects like trees. The natural condition exception shields the State from liability for injuries caused by the natural conditions of unimproved property, such as Colorado's numerous park and backcountry trails and unimproved camping areas. But that exception does not operate where the State builds an improved public camping facility like the one Burnett was properly using when she was severely injured. Moreover, the statutory definition of "dangerous condition" sufficiently limits the government's role as a guarantor of public safety to those instances when it knew or should have known, in the exercise of reasonable care, that a physical condition of a public facility constituted an unreasonable risk to public safety. *See* § 24–10–103(1.3), C.R.S. (2014).

### C. The Legislative Council Report Is Not Dispositive

¶ 62 The plurality's reliance on the *Report* is misplaced. *See* plur. op. ¶¶ 20–36. We previously declined to use the *Report* to decipher legislative intent. *See St. Vrain Valley Sch. Dist.,* ¶ 17, 325 P.3d at 1020 & n.7 (noting that there is no "pertinent legislative history" to illuminate the meaning of "public facility" as used in the CGIA because the *Report* contains no clear evidence of the legislature's intended meaning of that term). In any event, the plurality's use of the *Re-*

---

1. Although the plurality suggests that section 24–10–106(1)(e) does not impose a maintenance duty, plur. op. ¶ 32 n.5, the statutory definition of "dangerous condition" explicitly establishes a duty to reasonably maintain a public facility:

   "Dangerous condition" means ... a physical condition of a facility ... that constitutes an unreasonable risk to the health or safety of the public, which is known to exist or in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent act or omission of a public entity ... in constructing or *maintaining* such facility.

   § 24–10–103(1.3), C.R.S. (2014) (emphasis added).

*port* is not dispositive with regard to the interpretation of the natural condition exception.

¶ 63 The plurality points to language in the *Report* suggesting that the application of the exception turns on (1) whether the injury was caused by a man-made or natural dangerous condition and (2) the mechanism, rather than the location, of the injury. *See* plur. op. ¶¶ 25–27. Notably, however, the *Report* also explains that the policy underlying the natural condition exception was intended to shift the risk of injury to individuals only when they were actually *using* unimproved property. *See Report* at xxi–xxii. Because allowing people to enjoy public property in its natural state is desirable, "it is not unreasonable to expect persons who *voluntarily use* unimproved property in its natural condition to assume the risk of injuries arising therefrom." *Id.* (emphasis added). Indeed, the plurality seems to acknowledge this aspect in its statement that "[t]he General Assembly intended to encourage governmental entities to open primitive, government-owned property to the public by limiting the entities' exposure to liability from individuals who choose to use the property." Plur. op. ¶ 35.

¶ 64 In sum, the legislative history the plurality cites is inconclusive and not a reliable guide to this case. The plurality claims that this legislative history is "particularly instructive because it speaks to the specific circumstances of this case." *Id.* at ¶ 23 n.4. But it is clear the legislature never envisioned the peculiar circumstances the plurality and concurrence rely on here—where a tree's trunk is located outside an improved campsite but its branches overhang the campsite. Certainly, recognizing a waiver of immunity in this case would not thwart the policy of encouraging the public to use unimproved recreational property at its own risk.

¶ 65 This is not a case where the plaintiff was injured while she was voluntarily using unimproved property in its natural condition. Accordingly, it is unreasonable to expect Burnett to assume the risk of the injury that occurred here, under the facts of the complaint. Campers who pay to use campsites in state parks like Cherry Creek State Park expect the sites to be improved with basic features and free of the risks inherent to unimproved property. Here, the State's decision to build an improved campsite at this location, amid a grove of trees, created the risk that a camper using the site could be struck by an overhanging tree branch—and that risk required management by the public entity in charge.[2] *Cf. Troth v. State*, 117 N.J. 258, 566 A.2d 515, 521 (1989) ("Public property is no longer 'unimproved' when there has been substantial physical modification of the property from its natural state, and when the physical change creates hazards that did not previously exist and that require management by the public entity."). The plurality and concurrence improperly shifted the risk of injury onto an individual using improved recreational property, contrary to the General Assembly's intent.

### D. Other Authorities Distinguishable

¶ 66 The plurality and concurrence erroneously rely on cases from other jurisdictions that invert Colorado's well-established CGIA interpretation guidelines. *See* plur. op. ¶¶ 29–30; conc. op. ¶ 4. Unlike Colorado, California's governmental immunity statute "was designed to continue *and extend* the prior limited immunity, and therefore the Legislature did not intend a narrow construction" of its natural condition exception. *See Meddock v. Cnty. of Yolo*, 220 Cal.App.4th 170, 162 Cal.Rptr.3d 796, 803 (2013) (internal quotation marks omitted). Similarly, *Redinger v. Clapper's Tree Service Inc.*, 419 Pa.Super. 487, 615 A.2d 743, 747 (1992), involved a Pennsylvania recreational immunity statute that courts have interpreted to provide broad immunity to owners of "largely unimproved" land. However, because the General Assembly enacted the CGIA in derogation of common law, we must narrowly construe grants of immunity in the interest of compensating victims of governmental negligence. Therefore, although factually similar, the *Meddock* and *Redinger* decisions provide no authorita-

---

**2.** For example, no facts suggest that an unforeseen lightning strike or extraordinary weather event caused the branch to crash onto the tent in which Burnett was sleeping.

tive guidance in interpreting Colorado's governmental immunity statute.[3]

¶ 67 Accordingly, I respectfully dissent. I would reverse the court of appeals and hold that the trial court erred when it dismissed Burnett's claim.

I am authorized to state that CHIEF JUSTICE RICE and JUSTICE MÁRQUEZ join in this dissent.

---

3. I do agree with the plurality that the *Rosales* test does not derive from the language of the statute, is contrary to this court's repeated instructions that the CGIA's immunity waivers are to be construed broadly in favor of compensating victims of governmental negligence, and must be overruled. *See* plur. op. ¶¶ 44–46.